The INGERSOLL MILLING MACHINE
COMPANY, Plaintiff,

v.

M/V BODENA, her engines, boilers, etc.,
Excellent Marine, Inc., and Taiwan International Line Limited, Defendants.

TAIWAN INTERNATIONAL LINE
LIMITED, Third-Party Plaintiff,

v.

J.E. BERNARD, & CO.,
Third-Party Defendant.

The INGERSOLL MILLING MACHINE
COMPANY, Plaintiff,

v.

J.E. BERNARD & CO. and Fireman's
Fund Insurance Co., Defendants.

Nos. 80 Civ. 6729 (RLC), 81 Civ.
4744 (RLC).

United States District Court,
S.D. New York.

Sept. 4, 1985.

John Doar, Michael S. Devorkin, John Doar Law Offices, New York City, for plaintiff Ingersoll Milling Machine Co.; David Wade, Richard M. Zuckerman, Eugene O'Neill, Jr., New York City, of counsel.

Warren J. Marwedel, Stephen C. Veltman, Tribler & Marwedel, P.C., Chicago, Ill., for defendant Fireman's Fund Ins. Co.; Dale L. Schlafer, Chicago, Ill., of counsel.

Walker & Corsa, New York City, for defendant Excellent Marine, Inc.; Christopher H. Mansuy, Leroy S. Corsa, New York City, of counsel.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for defendant and third-party plaintiff Taiwan Intern. Line Ltd.; Thomas L. Tisdale, Vincent J. Barra, New York City, of counsel.

Wildman, Harrold, Allen & Dixon, Chicago, Ill., for defendant and third-party defendant J.E. Bernard & Co.; H. Roderic Heard, Susan L. Walker, Carol J. Gerner, Chicago, Ill., of counsel.

OPINION

ROBERT L. CARTER, District Judge.

I

*The Facts*

Plaintiff, the Ingersoll Milling Machine Co. ("Ingersoll"), is principally engaged in

the business of manufacturing special design machinery. It is privately owned and operates out of Rockford, Illinois. Plaintiff has brought two actions, 80 Civ. 6729, against the M/V Bodena ("the Bodena"), her engines, etc., Excellent Marine, Inc. ("Excellent Marine") and Taiwan International Line Ltd. ("Taiwan"), and 81 Civ. 4744, against J.E. Bernard & Co. ("Bernard") and Fireman's Fund Insurance Co. ("Fireman's Fund"). The cases have been consolidated for all purposes.

Defendant Excellent Marine is a foreign corporation doing business in Hong Kong and is the owner of the Bodena. Defendant Taiwan is a corporation doing business in Taiwan and has time chartered the Bodena from Excellent Marine pursuant to the terms and conditions of a charter party dated May 9, 1979. Both Excellent Marine and Taiwan are engaged in the business of common carriers of merchandise by water for hire and operated, managed or otherwise controlled the Bodena as a common carrier of merchandise by water for hire between New Orleans and Pusan, Korea, during the period relevant to this litigation. Defendant Bernard is a freight forwarder doing business in Elk Grove Village, Illinois, and other parts of the United States. Defendant Fireman's Fund is a wholly owned subsidiary of the American Express Co., having its principal place of business in San Francisco, California, and doing business throughout the United States.

In January, 1978, Waldrich Siegen, GmbH. ("Waldrich Siegen") a sister corporation to plaintiff and, like plaintiff, a wholly owned subsidiary of Ingersoll International, contracted to sell heavy specially designed machines to Hyundai International, Inc. ("Hyundai") in Korea. Waldrich Siegen engaged Ingersoll as subcontractor to manufacture Shop Order 24441 ("SO24441"), a ram type, horizontal spindle, traveling column machinery center for Hyundai at a purchase price of $2,108,000 and to arrange for its transportation to Korea.

Sometime in July or August, 1979, John Mellon of Ingersoll contacted Bernard and Gryphon Shipping Services, Inc. ("Gryphon"), a broker and steamship agent in Chicago. He asked William J. Brokamp of Bernard to shop around for freight rates on shipments of machinery to Korea, and asked Michael Malarski of Gryphon about the type of service available on Jin Yang Line for the shipment of machinery to Korea. He gave Malarski an estimate of the sizes of the expected shipments. Both Brokamp and Malarski made the requested inquiries.

Malarski spoke to Arnold Larsen, Vice President of Cathay Pacific Maritime, Taiwan's General Agent in New York, in about mid-August. Larsen offered space on the Bodena scheduled to leave New Orleans at the end of September for Korea. Larsen advised Malarski that another Taiwan vessel would also be available in early October, and Larsen agreed that if Malarski secured the Ingersoll cargo for shipment by Taiwan, Gryphon would receive a commission from Taiwan of 1.25–2.50% and the freight forwarder would receive a commission of 1.25%.

Malarski informed Mellon of the availability of the Taiwan Bodena in September and of another vessel in October. Mellon advised Malarski that he accepted the terms quoted for the Bodena, that the shipment would consist of 20 pieces which accorded with his initial estimate and that Bernard would be the freight forwarder. Malarski advised Brokamp that Taiwan would pay Bernard a commission of 1.25%.

Larsen testified at trial that he told Malarski that the shipment would be on deck since the Bodena had no available cargo space below deck. Malarski disputes being told or agreeing that the cargo was to be shipped on deck, or being advised that space was a problem on the Bodena. No booking notes were made by either Malarski or Larsen. Neither Larsen's notebook, which contained a chronological record of his booking communications, nor his worksheets noted that the Ingersoll cargo had been booked on deck. Moreover, the evidence at trial showed that there was space

below deck when the Ingersoll cargo was stowed.

The shipments of the 20 boxes to New Orleans commenced on August 29, 1979. One box came from Detroit, and the others left Rockford at various dates and were delivered to New Orleans by truck and rail to the custody of the Cooper Stevedoring Company at Julia Street Wharf in New Orleans. The machinery was packed by Ingersoll employees. Bernard was notified when the boxes left Rockford.

The Ingersoll cargo was loaded on September 26 and 27, 1979. Eighteen of the boxes were stowed on deck when the Bodena left New Orleans on September 27, 1979. When the Bodena left Savannah on October 14, 1979, three boxes of the Ingersoll shipment were stowed below deck.

By letter dated September 10, 1979, Fred Woywod of Ingersoll asked Bernard to secure three original and four copies of clean on board bills of lading, listing ocean freight prepaid. Georgette Seipler, the documentation clerk at Bernard, pursuant to Ingersoll's letter, prepared a master ditto form and the shipper's export declarations. Bernard by letter requested Taiwan to provide three original clean on board bills of lading and at least 10 copies, and on September 25, Bernard sent one master ditto form for the bills of lading and three export declarations to Mid Gulf, Taiwan's agent in New Orleans, and another master ditto form and a copy of the export declarations to Gryphon.

Bernard used the master ditto form to prepare its advance notice of shipment, which was sent to Woywod on September 25, 1979. Bernard's advance notice was similar to a bill of lading in format and contained the same shipping information that appears on the top half of a bill of lading. The advance notice which Woywod received on September 26, contained no notation as to stowage. Accompanying the advance notice was the following message: "the shipment described above is scheduled for exportation as indicated above ..." Woywod called Bernard to advise that all the data on the advance notice was correct

except the port of discharge should be changed to Pusan. As Woywod recalls his conversation with Seipler, she advised him that the port would be changed to Pusan and shipping charges would be added but that otherwise the bill of lading would mirror the advance notice.

On September 26, Woywod called Brokamp asking for the quickest way to get the bills of lading other than having to wait to have them come by mail. Brokamp suggested that Woywod might pick up the bills of lading at Gryphon in Chicago. On September 28, 1979, Woywod sent a messenger to Gryphon to pick up the documents, but they were not ready. An Ingersoll messenger returned to Chicago on October 1, 1979, picked up the originals and four copies and delivered them to Woywod who saw the documents at the end of the day. Bernard also received copies the same day. The bills of lading contained the words "on deck at shippers risk". Woywod did not know that these words rendered the bills of lading unclean. He did not notice them. However, the phrase was in bold letters for him to see.

The phrase "on deck at shipper's risk" was added to the bills of lading on September 27, 1979, by Mid Gulf, Taiwan's agent. After the vessel sailed, the master of the Bodena mailed the originals and 13 copies to the Chicago area.

Woywod sent copies of the bills of lading to Waldrich Siegen. Apparently, no one at Bernard, Gryphon, Ingersoll or Waldrich Siegen who saw the copies of the bills of lading, at least until preparation for this litigation began, took note of or recognized the significance of the "on deck at shipper's risk" legend on the bills of lading.

The voyage to Korea was beset with storms, heavy seas and wind. The ship experienced heavy rolling and pitching during parts of the voyage, and ocean water was constantly on deck. Some of the boxes on deck were broken. Substantial quantities of water penetrated the boxes, and sometimes the boxes sat in water to their top.

The Bodena arrived at Pusan on November 29, 1979, and unloaded. Ingersoll's cargo was discharged to Hyundai's stevedore, Kukji Transportation Co. The foreman found one on deck box discolored, some boxes broken and all the bands on the on deck boxes rusty. None of the under deck boxes were in this condition. On November 30, 1979, 17 Ingersoll boxes on deck were entered in the exceptional column on the damage report prepared by the foreman. The cargo was placed on four barges, subsequently discharged and moved to Changwon. K.M. Lee, Hyundai's assistant manager for heavy machinery, observed the discoloration, broken boxes, loose boards and rust on the parts of the machinery he could see. No pictures were taken at that time. At Hyundai's request a survey was taken by H. Lee, a licensed surveyor. The surveyor found discoloration, broken boxes, loose boards, and rust on the bands. He looked inside the boxes and described the surfaces seen as heavily rusted. He took 6 photographs to illustrate the conditions he found. In his report the surveyor described the damage to the cargo as irreparable because of widespread corrosion from sea water and exposure during the voyage.

Ronald Humphries was a service manager in the heavy division at Ingersoll at the time of these events. His assignment was to oversee the erecting of the machine at Changwon, and he went to Korea in December for that purpose. He arrived in Changwon on December 14, 1979. The cargo was located in the Hyundai's heavy fabrication shop. The structure of the building was completed, but some windows and doors were missing, and the floors were unfinished. The plant itself was about 500 yards from the river estuary. He found the cargo in similar condition to that found by the stevedore foreman on inspecting the cargo on discharge at Pusan, by K.M. Lee, Hyundai's assistant manager for heavy machinery on the cargo's arrival at Changwon and by H. Lee, the surveyor, when he inspected the cargo. Humphries returned to Changwon in March, 1980, and found the machinery in the same condition he had noted in December, 1979.

Plaintiff has an all risk policy with Fireman's Fund. This is an open marine cargo policy which covered all of Ingersoll's shipments. Ingersoll filled out a certificate of insurance for each shipment, indicating the contents of the cargo, its value, destination and the carrier. A particular shipment became covered under the policy when Ingersoll sent Fireman's Fund a copy of the certificate of insurance, or when Ingersoll issued a monthly declaration covering all shipments for that month. All shipments were automatically covered even if the certificate or monthly declaration was sent after a loss had occurred.

The pertinent provisions of the policy are set out below:

## INSURING CLAUSES

PERILS CLAUSE 16. Touching the adventures and perils which this Company is content to bear, and take upon itself in this voyage, they are of the Seas, Fires, Assailing Thieves, Jettisons, Barratry of the Master and Mariners, and all other like perils, losses and misfortunes, that have or shall come to the hurt, detriment or damage of the said goods and merchandise or any part thereof.

AVERAGE CLAUSES 17. (a) UNDER DECK shipments—Including containerized shipments under optional On Deck &/or Under Deck bill(s) of lading are insured. Warranted free from Particular Average unless the vessel or craft be stranded, sunk or burnt, but notwithstanding this warranty this Company is to pay any loss of or damage to the interest insured which may reasonably be attributed to fire, collision or contact of the vessel and/or craft and/or conveyance with any external substance (ice included) other than water, or to discharge of cargo at port of distress. The foregoing warranty, however shall not apply where broader terms of Average are provided for hereinafter.

**BROADER TERMS:**

Insured against all risks of physical loss or damage from any external cause irrespective of percentage, including theft, pilferage and/or non-delivery, but excluding, nevertheless, the risks of war, strikes, riots, seizure, detainment, confiscation, requisition, nationalization and other risks excluded by the "F.C.&S. and/or S.R. & C.C." warranties in the printed portion of the policy except to the extent that such risks may be specifically covered by endorsement, also warranted free from any claims arising out of the inherent vice of the goods insured or consequent upon loss of time and/or market.

(b) **ON DECK** shipments are insured:—

Warranted free of particular average unless caused by the vessel and/or interest insured being stranded, sunk, burnt, on fire or in collision with another ship or vessel or with ice or with any substance other than water, but liable for jettison and/or washing overboard, irrespective of percentage. The foregoing warranty, however, shall not apply when broader terms of Average are provided for hereinafter.

Clause 17(a) of the policy provides for full coverage of up to $2.5 million for all under deck shipments. Clause 17(b) negates coverage for partial loss of on deck shipments and, if covered, these shipments are insured only to a limit of $175,000 pursuant to clause 8(B)(2).

Fireman's Fund has interpreted clause 17(a) to cover losses suffered from on deck stowage where there is an under deck bill of lading or a bill of lading not specifying stowage but the cargo is stowed on deck without the insured's consent. It applies 17(b), however, where the cargo is stowed on deck and there is an on deck bill of lading without regard to the insured's consent.

Robert Donovan, Fireman's Fund's Marine Secretary and senior underwriter in the midwest, whose department had responsibility for writing the Ingersoll policy, testified that the contract terms of this insurance were not contained solely in the four corners of the policy. Donovan's initial reaction was that there should be coverage on the all risk policy. After he contacted John Stewart on the west coast and other senior Fireman's Fund officials, he changed his mind. Fireman's Fund officials seem to agree that the policy covers losses resulting from the insured's negligence since the policy was intended to cover fortuitous circumstances. While Robert Burke, Assistant Vice President and Nationwide Manager for Ocean Marine Claims, agreed that some negligence of the insured was covered, he was unable to define when such negligence was covered and when it was not.

## II

### Discussion

**A. Bernard, Taiwan and Excellent Marine**

There is no evidence that Malarski told anyone at Ingersoll that on deck shipment was to take place if the Bodena was booked. No booking notes were made by either Malarski or Larsen, and the various indications that Larsen relied on to support his version of what he told Malarski were at best inconclusive. Taiwan discounts the evidence at trial that there was available stowage below the deck of the Bodena when Ingersoll's cargo was loaded on board. Taiwan argues that the evidence presented did not take into account access; that cargo must be stowed in relation to time and ports of discharge. While this is true, Taiwan has not shown that the available space evidenced at trial could not have been used for plaintiff's cargo because the cargo in that space would have to be discharged before the Bodena reached Pusan. More importantly, it has not established that when the vessel arrived at New Orleans, stowage below deck could not have been so organized that plaintiff's cargo could have been stowed pursuant to a ra-

tional discharge plan based on time and port of discharge.

Defendants, certainly Excellent Marine, Taiwan and Bernard, vehemently argue that Gryphon was Ingersoll's agent. The record, however, does not support that contention. Taiwan paid Gryphon a commission in connection with this transaction, while Ingersoll paid Gryphon nothing. That fact alone makes Gryphon more clearly Taiwan's agent than Ingersoll's. Gryphon contacted carriers servicing the Far East at Ingersoll's request for information on the availability of vessels to carry three shipments of machinery to the Far East. Malarski found out from Larsen that the Bodena was available in September, 1979. He told Larsen of Ingersoll's needs and was offered a commission if he succeeded in getting Ingersoll's business for Taiwan. Gryphon became Taiwan's agent, not Ingersoll's. In addition, the only authority Malarski had from Ingersoll was to secure the information Mellon asked for and report back.

■■ A shipper's normal expectation on booking cargo for shipment is that it will be stowed below deck, unless the shipper expressly agrees to have the cargo stowed on deck. *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7, 14 (2d Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). *Accord, Calmaquip Engineering West Hemisphere Corp. v. West Coast Carriers, Ltd.*, 650 F.2d 633, 639 (5th Cir.1981). Since this would be the normal expectation and custom and usage of the business, any deviation therefrom would have to be established by those claiming it. *St. John's N.F. Shipping Corp. v. S.A. Companhia Geral Commercial Do Rio De Janiero*, 263 U.S. 119, 124, 44 S.Ct. 30, 31, 68 L.Ed. 201 (1924). Even proof that Malarski and Larsen agreed that the Ingersoll shipment was to go on deck would be insufficient to show that Ingersoll knew or agreed to on deck shipment prior to or at the time of the booking or loading of the cargo.

There is no evidence that Ingersoll specified below deck stowage either. Nor was the contention that Ingersoll always shipped below deck established. Indeed, the record shows that subsequent to this shipment, some Ingersoll machinery was carried on deck on another vessel. All of this is beside the point, however, since our concern is only with the Bodena's voyage to Pusan, Korea, leaving New Orleans on September 27, 1979. As to that voyage there is no credible evidence that Ingersoll agreed to an on deck shipment. Stowage on deck is the unexpected, which the carrier cannot do without the express permission of the shipper. It clearly would make no sense for Ingersoll to expose its $2 million machinery to on deck shipment at its own risk.

Plaintiff engages in extensive discussions in its post trial brief of the validity under the maritime law of oral contracts of carriage and argues that the arrangements in this case were such. However, that question need not be explored in any depth. There is no dispute that a contract of carriage existed. Taiwan contends that there was an oral agreement to allow the Bodena to carry the cargo on deck, and that such a contract was evidenced by the on deck at the shipper's risk bills of lading. Since Taiwan and anyone making that contention has the burden of proving such agreement, and Taiwan's proof does not meet that burden, we have a contract of carriage without evidence of any agreement by the shipper to allow the carrier to stow the cargo on deck.

Defendants argue that Mellon was present in New Orleans at the loading of the Ingersoll cargo on September 26 and 27. The evidence shows that Mellon was in New Orleans on September 21, but there is no evidence that he or any other Ingersoll representative was present when cargo was loaded on September 26 and 27.

The form of Bernard's advance notice would tend to give the recipient the idea that the notice contained all the vital information as it would appear on the bills of lading. Bernard seeks to discount Woywod's recollection of his September 26, 1979 conversation with Seipler to the effect

that, except for the change of the port of discharge and shipping charges, the bills of lading would be the same as the advance notice, but it has the ring of truth. Nothing was ever said to Bernard or Seipler by Mid Gulf or Taiwan about on deck stowage of the Ingersoll machinery. Stowage is not usually specified on a clean bill of lading. Seipler had every reason to believe that the bills of lading, with the port of discharge corrected and the shipping charges added, would not differ from the advance notice. However, Woywod's failure to examine the bills of lading when he received them on October 1, 1979, cannot be justified on the basis of his September 26 conversation with Seipler. Ingersoll's apparent position that it had no knowledge that its machinery was carried on deck until the damage was discovered in Korea has no merit. It had constructive notice that its goods were being carried on deck at Ingersoll's risk on October 1, 1979, when the bills of lading were delivered to Woywod. The fact that he did not understand the legal significance of the legend on the bills of lading is immaterial for the purpose of establishing when Ingersoll was on notice that its machinery was being shipped to Korea on deck and at its risk.

Bernard, Taiwan, and Excellent Marine spent an inordinate amount of time contending at trial and in their briefs that the bills of lading were clean. That argument is without merit and is wholly inconsistent with the purpose and meaning of a clean bill of lading.

■ Under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 *et seq.*, a prima facie case of carrier liability is established by proof of delivery of the cargo to the carrier in good condition and discharge at destination in a damaged state. A clean on board bill of lading as a general rule satisfies the showing of good order at the time of shipment. *Emmco Insurance Co. v. Wallenius Caribbean Line, S.A.*, 492 F.2d 508, 513 (5th Cir.1974). The very purpose of clean on board bills of lading is to provide the shipper with documentation that the damage to his goods, if any, occurs,

cannot be attributed to him. In short, its purpose is to relieve the shipper of risk during the voyage. The bills of lading in this case maintain liability on Ingersoll throughout the voyage. Such bills cannot be clean. In any event, Judge Werker, who first handled this case in this court, and I have no trouble finding these bills of lading providing for on deck stowage at the shipper's risk unclean. As Judge Werker stated in disposing of the motions for summary judgment. "It long has been recognized that a clean bill of lading either is silent on the method of stowage, thereby portending that goods are to be stowed under deck, or does not specifically provide for on-deck stowage. There is no doubt that a reference to the poor condition of the cargo would make a bill of lading unclean. Even in the absence of such a reference, however, a ... bill of lading that specifically calls for on-deck stowage is not clean." Memorandum Decision, June 23, 1983, slip op. at 6 (citations omitted).

Taiwan argues that since Woywod thought the bills of lading were clean, as did Bernard and Taiwan, there was a meeting of the minds and a valid bargain was struck. That argument makes no sense. Woywod may not have recognized a clean bill of lading when he saw one in 1979, but he asked in clear, unambiguous language for Bernard to supply clean bills of lading. Bernard and Taiwan are in the business of dealing with bills of lading constantly. Bernard held itself out as knowing what a clean bill of lading was. At any rate, Bernard and Taiwan should have known what constitutes a clean bill. That they were ignorant in this regard will not suffice to free them from responsibility. Whatever Bernard's and Taiwan's view about on deck shipment being consonant with instructions to provide clean bills of lading, they had to know that shipper's risk notation rendered the bills of lading unclean.

Bernard argues that because it performed some but not all of the duties of a freight forwarder, it should not be held accountable for any damage to plaintiff's shipment. Bernard points out that it did

not engage the Bodena, and it did not pick up the original bills of lading or deliver them to Ingersoll. That is beside the point. Bernard was engaged to secure clean on board bills of lading, and it failed to do so. Additionally, on receipt of the bills of lading on October 1, 1979, it failed to examine the copies it received and failed to advise Ingersoll that Taiwan had not followed instructions to issue clean bills of lading.

The testimony, which at trial and in its brief counsel for Bernard seek to distort, is that when Woywod spoke to Brokamp about obtaining the bills of lading more quickly than awaiting their delivery by mail to Rockford, Woywod decided that Ingersoll would pick up the documents directly on his own. That is not true. Brokamp suggested that Woywod pick the bills of lading from Gryphon in Chicago. The suggestion did not originate with Woywod. While there was no testimony to this effect, the court's surmise is that Brokamp suggested Gryphon in Chicago rather than Bernard in Elk Grove Village, because Brokamp assumed that the mail from New Orleans would reach Gryphon's office in Chicago before it would reach Bernard's office in Elk Grove Village.

Bernard contends that Woywod's decision to secure the bills of lading directly from Gryphon rather than from Bernard relieved Bernard of any further responsibility. I disagree. Bernard was requested to secure clean on board bills of lading. It took on that assignment as Ingersoll's agent. Its responsibility included examining the issued bills of lading to determine whether they were in fact clean. Bernard failed to do that.

Plaintiff has introduced evidence tending to establish that Bernard did not have well trained or knowledgeable personnel but this, as with so much of the evidence and contentions in this case, constitutes gratuitous surplusage. Whether incompetence, sloth or lack of attention was the cause, Bernard did not perform its part of the bargain. That failure, for whatever reason, suffices to render Bernard liable.

Taiwan has failed to show that it put plaintiff's merchandise on deck with the latter's permission. The evidence discloses that Mid Gulf added the legend to the bill of lading without consultation with plaintiff or anyone authorized to act for the plaintiff. Under such circumstances, the bills of lading cannot be said to represent the contract of carriage between the parties.

■ Taiwan contends that Ingersoll's failure to act between October 1, 1979, when it received the bills of lading and October 14, 1979, when it could have intercepted the vessel and off shored the merchandise before the Bodena left United States ports, should be construed as acceptance of its unilateral act. That contention is rejected.

The record indicates that Ingersoll was of the impression that the Bodena was proceeding directly from New Orleans to Korea. By checking shipping information, plaintiff could have discovered that the Bodena was scheduled to stop at various United States ports before proceeding to Korea. Plaintiff, however, should not be penalized for failure to take such steps when the carrier acts unlawfully and unilaterally in stowing the cargo on deck and, contrary to the shipper's instructions, issued unclean on deck at the shipper's risk bills of lading. While the off shoring of the merchandise at some United States port is presented as an option plaintiff failed to exercise, there was no evidence to show the consequences of such a course of action. Could plaintiff have readily secured space on another vessel bound for Pusan? When was such passage available? What costs would plaintiff have had to incur to exercise that option? The court cannot determine from the dearth of evidence on the issue that off shoring was a real option that could have been exercised. The burden was on defendants to establish that such a real option existed.

■ Bernard for the first time asserts in its post trial brief in chief (pp. 3–8) that the court lacks subject matter jurisdiction because Ingersoll's claims as to Bernard do

not come within the admiralty jurisdiction of the court. Federal courts have traditionally exercised admiralty jurisdiction over shipper's claims against freight forwarders. *See, e.g., Reid v. Fargo,* 241 U.S. 544, 545–46, 36 S.Ct. 712, 713, 60 L.Ed. 1156 (1916); *The Cayo Mambi,* 1 F.Supp. 116, 117 (E.D.N.Y.1932), *aff'd,* 62 F.2d 791 (2d Cir.1933); *A.P. Moller Steamship Co. v. Bromhead & Dennison, Ltd.,* 1982 AMC 1455 (S.D.Tex.1981). *See also A. Murr, Export/Import Traffic Management and Forwarding* 49 (6th ed. 1979) (federal district courts have original jurisdiction in admiralty in practically all civil and/or criminal actions brought by, or against, foreign freight forwarders).

The cases cited by Bernard are distinguishable. *Maher v. Newtown Creek Towing Co.,* 190 F.Supp. 933 (S.D.N.Y.1961) (Weinfeld, J.), involved the question of jurisdiction under general maritime law of a cause of action asserted against a non-diversity defendant by virtue of its joinder with the Jones Act. *P.D. Marchessini & Co. v. Pacific Marine Corp.,* 227 F.Supp. 17, 18 (S.D.N.Y.1964) (Weinfeld, J.), involved "preliminary service leading to maritime contract." The same is true of *The Thames,* 10 F. 848 (S.D.N.Y.1891) (Brown, J.), and of *The Harvey and Henry,* 86 F. 656, 658 (2d Cir.1898). *David Crystal, Inc. v. Cunard Steamship Co.,* 223 F.Supp. 273, 293 (S.D.N.Y.1963) (Levet, J.), *aff'd,* 339 F.2d 295 (2d Cir.1964), *cert. denied,* 380 U.S. 976, 85 S.Ct. 1339, 14 L.Ed.2d 271 (1965), involved services performed after the voyage had been completed. In this case, the services Bernard performed were not preliminary or rendered after completion of the voyage.

■ "The character of the work is determinative of the question whether the agreement was maritime and the jurisdiction properly laid in admiralty." *The Hinkins Steamship Agency v. Freighters, Inc.,* 498 F.2d 411, 412 (9th Cir.1974). Services such a "supervising dockage, pilotage, tug assisting ... cleaning of holds ... and handling operating details pertaining to the vessel's call [at a port of dis-charge]" were held to be "clearly maritime in nature." *Id.* Preparation and processing the bill of lading, the export declarations and payment of the ocean freight "were clearly maritime and necessary" for the shipment by ocean voyage to Korea. *Id.* Moreover, as the court stated in the above case referring to authorities, at least one of which Bernard relies on, "[u]nder more modern decisions, appellant's cases are of doubtful validity." *Id.* The jurisdictional contention has no merit.

■ Nor does the argument that the small print on Bernard's invoice to Ingersoll, dated September 28, 1979, operates to limit Bernard's liability to $50. This invoice was received by Ingersoll on October 4, 1979. This was after the Bodena had sailed with Ingersoll's cargo improperly stowed. A post hoc presentation containing a clause unilaterally purporting to indemnify one of the parties against liability does not operate to modify the original agreement unless the terms are agreed to by the other party and consideration therefor received. *Tanker & Tramps Corp. v. Tugs Jane McAllister and Margaret M. McAllister,* 358 F.2d 896, 899–900 (2d Cir. 1966). The argument that the invoice complied with custom and usage also has no merit. There was no evidence at trial that use of the invoice with the limitation clause was such as to establish it as custom and usage of the trade. *Tankers & Tramps Corp. v. Tugs Jane McAllister and Margaret M. McAllister, supra,* at 899 (there must be evidence presented to establish sufficient frequency of use of the restrictive clause to warrant a finding of custom and usage).

■ While a clean on board bill of lading always establishes that unpackaged goods were in good order at the time of shipment, *Emmco Insurance Co. v. Wallenius Caribbean Line, S.A., supra,* when the goods are packaged such clean bills of lading merely attest to the apparent good condition of the cargo based on external inspection. *See, e.g., Vana Trading Co. Inc. v. S.S. Mette Skow,* 556 F.2d 100 (2d Cir.1977); *Midwest Nut and Seed Co., Inc.*

*v. S.S. Great Republic,* 1979 AMC 379, 383–84 (S.D.N.Y.1978) (Carter, J.), cited with approval in *Caemint Food Inc. v. Brasileiro,* 647 F.2d 347, 353 and n. 5 (2d Cir.1981). Where a hidden vice or defect may be the cause of cargo damage, the shipper must establish that the goods were delivered ˙in good condition. *See Midwest Nut & Seed Company, Inc. v. S.S. Great Republic, supra.* There is no evidence that the Ingersoll cargo had a hidden defect or was delivered to the Bodena in a rusted or deteriorated condition. Nor is there any credible evidence that the machinery was inadequately or carelessly packed. The testimony was that the packing and crating, except for one item, was done at Rockford, and that the machinery was packaged in Ingersoll's customary manner. That the packaging did not withstand exposure to turbulence and storms to which the machinery and its packaging were exposed on open deck is not proof of negligent or improper packaging by Ingersoll. The evidence is clear that the rust which afflicted the machinery stowed on the deck of the Bodena was not present in the three crates stowed below deck.

Plaintiff has established that the rust damage to the machinery resulted from exposure on deck to sea water, and has met its burden of showing that the rust did not result from exposure in Korea. The rust was the result of sea water and condensation. The cargo on deck was exposed to heavy storms and wind turbulence. There is no credible evidence that the rusting was present before loading of the cargo at New Orleans, or that the rusting did not occur until after discharge at Pusan or that there was any material additional rusting while the cargo was in Korea. The court is satisfied that the rusting to the on deck cargo resulted from the Bodena sailing through a turbulent ocean and several severe storms.

Both Taiwan and Bernard are held liable jointly and severally in full to Ingersoll for damages it suffered in respect of SO 24441.

█ I cannot see any liability, however, on the part of Excellent Marine. It owns the Bodena, but control of the vessel in regard to making a contract of carriage of cargo was in Taiwan's hands under a time charter. The master of the Bodena and the crew were under Excellent Marine's control. The form of the bills of lading was the responsibility of Taiwan. The master accepted the bills of lading as presented. He did not authorize or require that they be issued under his authority. I see no connection whatsoever between Excellent Marine and plaintiff for the purpose of holding Excellent Marine liable for any damages to Ingersoll's cargo.

Plaintiff sought to establish that the crew was incompetent and negligent in the handling of the ship so as to render the Bodena unseaworthy. The court is not persuaded. The claims against Excellent Marine are dismissed.

### B. *Fireman's Fund*

Fireman's Fund seems to argue that the burden is on plaintiff in respect of this all risk insurance policy to establish that its loss resulted from an insured peril. This is so, it contends, because Fireman's Fund is not arguing "an exclusion or exception to 'all risk' coverages. Rather it is the very question of whether 'all risks' or 'limited risk' coverage is afforded this loss which is at issue. Hence the burden remains on Ingersoll to prove that this loss resulted from an insured peril." Fireman's Fund Post Trial Brief at 9. That convoluted statement can only mean precisely what Fireman's Fund says it does not mean, i.e. that this loss is excluded or excepted from "all risk" coverage.

█ The rule as I understand it, is that an all risk policy places the burden on the insured to establish only the existence of the all risk policy and its loss. Then the burden shifts to the insurer to show that the coverage of the loss comes within one of the exceptions. *Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.,* 505 F.2d 989, 999 (2d Cir.1974). Fireman's Fund argues that the loss is covered by clause 17(b) which would mean no coverage on a partial loss and a limit of $175,000

recovery as per clause 8(B)(2) of the policy in any event. Under *Pan American* and cognate cases, Fireman's Fund has the burden to establish that clause 17(b) is applicable, that its exception or exclusion applies. *See also Holiday Inns, Inc. v. Aetna Insurance Co.,* 571 F.Supp. 1460, 463–64 (S.D.N.Y.1983) (Haight, J.); *Redna Marine Corp. v. Poland,* 46 F.R.D. 81, 86 (S.D.N.Y. 1969) (Mansfield, J.). Ingersoll has made out a prima facie case by establishing that it is the insured under the policy with its all risks provisions and that it suffered a loss of cargo.

■ In construing the policy, the court is to be guided by federal admiralty law where there is an established rule. *Walter v. Marine Office of America,* 537 F.2d 89, 94, *reh. denied,* 542 F.2d 1174 (5th Cir. 1976). Only in the absence of established federal rules will state law govern. *Wilburn Boat Co. v. Fireman's Fund Insurance Co.,* 348 U.S. 310, 316, 75 S.Ct. 368, 371, 99 L.Ed. 337 *reh. denied,* 349 U.S. 907, 75 S.Ct. 575, 99 L.Ed. 1243 (1955). In that regard in applying New York's choice of law tenets, the law of the state having the most contacts and interest in the controversy, would govern. *J. Zeevi & Sons, Ltd. v. Grindlays Bank (Uganda), Ltd.,* 37 N.Y.2d 220, 371 N.Y.S.2d 892, 333 N.E.2d 168 (1975), *cert. denied,* 423 U.S. 866, 96 S.Ct. 126, 46 L.Ed.2d 95 (1975). Both California and Illinois would seem to qualify as the state with the greatest interest: California because it is the state where Fireman's Fund has its principal place of business; and Illinois because of its interest in having citizens and residents of the state collect what is due them from out of state insurance companies. I believe New York courts would find Illinois has the greatest interest in this controversy. The issue, however, seems academic since on matters material to determination of this controversy, federal maritime law is firmly established, and Illinois law appears to be consistent with federal law.

■ A marine insurance policy, as well as other types of insurance policies, is to be liberally construed in favor of the insured.

*Kalmbach, Inc. v. Insurance Co. of the State of Pennsylvania,* 529 F.2d 552, 555 (9th Cir.1976); *Fogelmark v. Western Casualty & Surety Co.,* 11 Ill.App.2d 551, 556, 137 N.E.2d 879, 882 (1956). Where the terms are clear and unambiguous, they are given appropriate effect. *United States Fire Ins. Co. v. Schnackenberg,* 88 Ill.2d 1, 4, 57 Ill.Dec. 840, 842, 429 N.E.2d 1203, 1205 (1981); *Zipf v. Allstate Insurance Co.,* 514 Ill.App.3d 103, 11 Ill.Dec. 798, 369 N.E.2d 252 (1977).

The language in the policy originated with Fireman's Fund. Therefore, if the provisions are ambiguous or equivocal, they must be construed "most favorably to the insured and most strictly against the insurer." *Index Fund, Inc. v. Insurance Co. of North America,* 580 F.2d 1158, 1162 (2d Cir.1978), *cert. denied* 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979), cited with approval in *Vargas v. Insurance Co. of North America,* 651 F.2d 838, 839–40 (2d Cir.1981).

Continuing at 840, the *Vargas* court said: "The insurer bears a heavy burden of proof, for it must ' "establish that the words and expressions used [in the insurance policy] *not only are susceptible of the construction sought by [the insurer] but that it is the only construction which may be placed on them."* ' *Filor, Bullard & Smyth v. Insurance Co. of North America,* 605 F.2d 598, 602 (2d Cir.1978), *cert. denied,* 440 U.S. 962 [99 S.Ct. 1506, 59 L.Ed.2d 776] (1979) (quoting *Lachs v. Fidelity & Casualty Co. of New York,* 306 N.Y. 357, 365–66, 118 [118 N.E.2d 555] (1954) ). The insurer is 'obliged to show (1) that it would be unreasonable for the average man reading the policy to [construe it as the insured does] and (2) that its own construction was the only one that fairly could be placed on the policy.' *Sincoff v. Liberty Mutual Fire Insurance Co.,* 11 N.Y.2d 386, 390, 230 N.Y.S.2d 13, 16, 183 N.E. 899, 901 (1962). Thus the question in this case is narrow: is the insurer's interpretation of the contract the only reasonable and fair construction as a matter of law?" (Emphasis in the original.)

There is no mention of bills of lading in clause 17(a) or 17(b) of the insurance policy. They speak of under deck and on deck shipments. The officials of Fireman's Fund testified that Ingersoll's failure to realize or its slowness in realizing that it had an on deck bill of lading caused Fireman's Fund no prejudice. Although Burke did testify that if he found that a shipper has been issued an on deck bill of lading after the vessel sailed and the insured had diligently done all it could, he might find coverage. I do not understand why this situation does not meet that criterion. On the one hand, he, Donovan and Stanley Krasula, Claims Manager of the Ocean Marine Claims Department, seem to view the bill of lading as controlling without regard to the fact that the shipper was not at fault. On the other hand Burke sometimes seems to be saying that other factors might govern. In any event, the policy has been rendered ambiguous by the gloss Fireman's Fund has engrafted on 17(a) and 17(b).

Fireman's Fund officials accepted Ingersoll's version of the events that it booked an under deck shipment and on deck stowage was unauthorized. If under deck shipments in clause 17(a) to which full coverage is accorded the insureds means on deck shipments without the insured's assent with under deck bills of lading, it also can be reasonably read to cover on deck shipments without the insured's assent with on deck bills of lading issued contrary to its instructions. It was agreed that Fireman's Fund's interpretation of clauses 17(a) and (b) requires one to go beyond the words in the clauses. The interpretation Fireman's Fund has adopted is not written in the policy itself, nor in any interpretive Fireman's Fund manual or document. It was decided upon apparently *ad hoc*, among Burke, Stewart, Donovan and Krasula to deal with this unusual situation.

The reason for not applying clause 17(b) to on deck cargo with an under deck bill of lading was explained by Burke as based on equitable considerations. Even though the cargo is physically on deck, "there was a contract for it to go under deck." That the cargo is on deck he regarded as fortuitous. The same analysis justifies 17(a) coverage to cargo which it placed on deck with an on deck bill of lading without the owner's consent. In these circumstances the contract is for under deck carriage. The circumstances to the shipper are just as fortuitous in the one case as in the other.

Fireman's Fund sought to justify the interpretation given the court on the basis of their and Ingersoll's understanding of what the policy meant. But the interpretation offered constituted the subjective views of Fireman's Fund officials, never communicated to Ingersoll until this litigation. The proffered explanation of the policy's meaning, therefore, cannot be used to establish that Fireman's Fund and Ingersoll had such intent and understanding when they entered into the insurance contract. *Lubrication Maintenance, Inc. v. Union Resource Co., Inc.*, 522 F.Supp. 1078, 1081 (S.D.N.Y.1981) (Weinfeld, J).

This is an all risks policy which covers "all losses that are fortuitous no matter what caused the loss." *Goodman v. Fireman's Fund Insurance Co.*, 600 F.2d 1040, 1042 (4th Cir.1979). A loss is not fortuitous "only if it results from an inherent defect, ordinary wear and tear or from the intentional misconduct of the insured." *Id.* Fireman's Fund officials conceded that the insured's negligence was considered a fortuitous event. Burke sought to limit this to certain circumstances, but he could not give any clear parameters as to what negligent circumstances were fortuitous and those that were not. According to him the question had to be decided on a case by case basis. This approach is not appropriate. The meaning of an insured's negligence as embraced within fortuity must be clear to both the insured and the insurer. The carrier here breached the contract of carriage by placing the cargo on deck, and the loss to Ingersoll necessarily became fortuitous.

The explanations given by Fireman's Fund seems contrived, concocted solely to keep from paying up to $2.5 million which

was the extent of Ingersoll's coverage under this policy. Because the policy covered fortuitous circumstances, officials at Fireman's Fund must have realized that without the gloss of the under deck bills of lading engrafted on 17(a), that the phrase under deck shipments had to embrace on deck shipments without the shipper's consent, since the latter was a fortuitous event. By its strained interpretation of 17(a) to cover only under deck bills of lading no matter where the cargo was physically stowed, Fireman's Fund official sought to defeat Ingersoll's legitimate claims. This has caused Ingersoll to have to undertake the cost of suing all other parties involved—a task which more properly should be assumed by the insurance company after having paid Ingersoll's claim.

There was conflicting testimony among the officials concerning the basis for denying coverage, and Donovan and Burke's deposition testimony was in direct conflict with critical statements they made on the witness stand. Thus, in depositions Burke and Donovan would appear to take one position which each would alter, modify or contradict at trial. These conflicts and inconsistencies helped convince the court that Fireman's Fund had conjured up its strained reading of the insurance policy solely in an effort to avoid accepting the liability the policy imposed.

■ Plaintiff's pursuit of the other defendants for the damage sustained was a direct and forseeable consequence of the Fireman's Fund breach. *Mitsui v. American Export Lines*, 636 F.2d 807, 824 (2d Cir.1981). Hence the litigation expenses Ingersoll incurred are recoverable. *Artvale Inc. v. Rugby Fabrics Corp.*, 232 F.Supp. 814, 826 (S.D.N.Y.1964) (Levet, J.), *aff'd*, 363 F.2d 1002 (2d Cir.1966).

Plaintiff also relies on clause 25 of the policy as requiring Fireman's Fund to reimburse plaintiff for all the litigation costs it has incurred. That clause provides:

> In case of any loss or misfortune, it shall be lawful and necessary for the Assured, his or their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard, and recovery of the aforesaid subject matter of this insurance, or any part thereof, without prejudice to this insurance, the charges whereof this Company shall bear in proposition to the sum hereby insured.

That clause, however, seems principally invoked to obtain reimbursement for those expenses incurred in an effort to mitigate damages, *see, e.g., Blasser Brothers Inc. v. Northern Panamanian Line*, 628 F.2d 376, 378 (5th Cir.1980), and has no application to plaintiff's litigation and attorneys' fees claims here.

■ As a rule attorneys' fees are awarded in maritime cases in order to make the insured whole, *Hamilton v. Canal Barge Co.*, 395 F.Supp. 978, 990 (E.D.La. 1975), and attorneys' fees are recoverable in this instant case in view of the fact that plaintiff's recovery against Fireman's Fund will be reduced by whatever the former recovers from the other defendants. However, the reduction of Fireman's Fund's liability to plaintiff is the net of such recovery, less Ingersoll's expenses incurred in prosecuting this litigation. Those expenses necessarily embrace attorneys' fees. *McDonald v. E.J. Lavino Co.*, 430 F.2d 1065, 1073 n. 7 (5th Cir.1970); *Baier v. State Farm Insurance Co.*, 28 Ill.App.3d 917, 329 N.E.2d 543 (1st Dist.1975), *aff'd* 66 Ill.2d 119, 5 Ill.Dec. 572, 361 N.E.2d 1100 (1977).

In light of the purpose in awarding attorneys' fees in admiralty case, *see Mitsui & Co., Ltd. v. American Export Lines, supra; Artvale, Inc. v. Rugby Fabric Corp., supra,* the limitation of $5,000 argued for by Fireman's Fund as being required under Illinois law, Fireman's Fund Post Trial Brief at 71, has no application to this case. The award of attorneys' fees is in keeping with the admiralty rule which is to make the aggrieved party whole. *See Mitsui & Co., Ltd. v. American Export Lines, supra; Artvale, Inc. v. Rugby Fabric Corp., supra.*

Within one month of the issuance of this opinion, counsel for Ingersoll is to submit evidence of the litigation expenses it in-

curred in this case. These expenses should be shown by affidavits, time sheets and other data pertinent to the matter, with a memorandum supporting recovery for what is claimed. Fireman's Fund should file its opposing papers three weeks after plaintiff's submission. The court will determine the matter on such submissions or, if deemed necessary, set a hearing prior to making a final decision.

No other punitive award will be made. While defendant should have paid plaintiff under clause 17(a), its action in refusing to do so awaiting the outcome of this litigation does not constitute such egregious conduct to warrant an award of punitive damages other than attorneys' fees and litigation expenses, in addition to compensatory damages.

## C. Damages

Plaintiff's damages are the costs incurred in repair to the machinery. To these costs a claimed 43% is added for overhead expenses and profits. While overhead costs and profits are legitimate items, the markup plaintiff seeks is not warranted.

Plaintiff seeks $1,149,647.57 for the costs of repair of the rusted machine, plus $90,969.65 for delay in contract payments by Hyundai caused by the damage and necessary repairs.

There is no dispute as to $153,818.10 for freight and insurance charges. There is no dispute as to the $70,337 C & F cost for transporting the repaired machine from Germany to Korea. Those items, therefore, are allowed. The other items are disputed.

There is resistance to the claim of $90,969.65 for interest for delay in receiving payment from Hyundai for the machine. This is a legitimate item. The interest is calculated from the date payment is due to the date payment is received. Interest is calculated daily and averages about 12%. Interest calculated at the market rates for this item is appropriate. *Black Sea & Baltic Insurance Co., Ltd. v. S.S. Hellenic Destiny*, 575 F.Supp. 685, 695 (S.D.N.Y. 1983) (Lasker, J.). During the period re-quired for repair plaintiff lost use of the funds which it would have otherwise received. Accordingly, $90,670.00 is allowed (I am only calculating to the nearest whole dollar figure).

For items bought and for labor costs, plaintiff seeks an extremely liberal markup for overhead expenses and profits. The court sees no justification for any markup being added to the cost for parts taken from Ingersoll-Rockford inventory or purchased by it. These items listed as $9,532 and $18,471 are allowed without markup. Labor costs for parts built by Ingersoll-Rockford are arrived at by computing the basic cost of labor which is $6,713.73, adding overhead costs in excess of 30% and then applying a 40% profit. That seems excessive. A markup of 40% should be adequate to cover overhead and profits on this item. Accordingly, $30,853.00 is allowed. Reimbursements including salaries of $46,635 and $32,000 are allowed. Total repair and repackaging costs of $525,284 are allowed. Overhead and profits have been included in this figure. Thus the total allowed for damages for repair, repackaging and delivery of the machine to Korea is $977,899.

Prejudgment interest in admiralty cases is to be granted in the discretion of the trial court and "should be granted in the absence of extraordinary circumstances." *Mitsui & Co., Ltd. v. American Export Lines*, 636 F.2d 807, 823 (2d Cir.1981). The latest case in this circuit to deal with the subject, *In the Matter of the Complaint of Rio Grande Transport, Inc. v. Rio Grande Transport and Embarsay of Tunisia*, 770 F.2d 262 (2nd Cir.1985), reached the same conclusion. As I read this rule, prejudgment interest must be allowed unless good cause warrants denial. To do otherwise would constitute an abuse of discretion. *Socony Mobil Oil Co. v. Texas Coastal and International, Inc.*, 559 F.2d 1008, 1014 (5th Cir.1977).

The rate of interest rests in the court's broad discretion, *Independent Bulk Transport, Inc. v. The Vessel "Morania Abaco"*, 676 F.2d 23, 27 (2d Cir.1982). Plaintiff "is entitled to income which the

monetary damages would have earned and that should be measured by interest on short term risk free obligations." *Id.* In this circumstance plaintiff has lost income that would have been made on money spent to make these repairs. Thus interest should run "from date repairs were paid for until the date of reimbursement". *Id.*, (Newman, J., concurring). The interest rate to be applied is the rate associated with federal paper as found in the Federal Reserve Bulletin covering the time in question.

The parties are to calculate prejudgment interest under this formula and submit same in plaintiff's proposed final order and in defendants' proposed counter orders.

Judgment is awarded against Taiwan, Bernard and Fireman's Fund jointly and severally in the amount of $977,899, plus prejudgment interest pursuant to the formula outlined in this memorandum. In addition, judgment is awarded against Fireman's Fund in the amount of plaintiff's litigation expenses and attorneys' fees. Plaintiff is to recover its costs.

IT IS SO ORDERED.