The INGERSOLL MILLING MACHINE CO., Plaintiff-Appellee in 85–7941, 85–7945, and 86–7405, Plaintiff-Appellant in 86–7413, Plaintiff-Cross-Appellant in 86–7413 re: 85–7941, 85–7945, and 86–7405,

v.

M/V BODENA, her engines, boilers, etc., Excellent Marine, Inc., Taiwan International Line Limited, J.E. Bernard & Co., and Fireman's Fund Insurance Co., Defendants,

Excellent Marine, Inc., Defendant-Appellee in 86–7413,

Taiwan International Line Limited, Defendant-Third Party Plaintiff-Appellee in 85–7941, Defendant-Appellant in 86–7405, Defendant-Cross-Appellant in 86–7405 re: 85–7941, Defendant-Cross-Appellee in 86–7413,

J.E. Bernard & Co., Defendant-Third Party Defendant-Appellant in 85–7941, Defendant-Cross-Appellee in 86–7405 and 86–7413,

Fireman's Fund Insurance Co., Defendant-Appellee in 85–7941 and 86–7405, Defendant-Appellant in 86–7945, Defendant-Cross-Appellee in 86–7413.

Nos. 219–221 and 311, Dockets 85–7941, 85–7945, 86–7405 and 86–7413.

United States Court of Appeals, Second Circuit.

Argued Oct. 6, 1986.

Decided Sept. 14, 1987.

Michael S. Devorkin, New York City (John Doar, John Doar Law Offices, New York City, of counsel), for The Ingersoll Milling Machine Co.

Thomas L. Tisdale, New York City (Vincent J. Barra, Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, of counsel), for Taiwan Intern. Line Ltd.

Susan L. Walker, Chicago, Ill. (H. Roderic Heard, Carol J. Gerner, Wildman, Harrold, Allen & Dixon, Chicago, Ill., Thomas M. Geisler, Jr., Shearman & Sterling, New York City, of counsel), for J.E. Bernard & Co.

Warren J. Marwedel, Chicago, Ill. (Stephen C. Veltman, Dion J. Sartorio, Tribler & Marwedel, P.C., Chicago, Ill., of counsel), for Fireman's Fund Ins. Co.

(Joseph J. Magrath, 3rd, Douglas A. Jacobsen, Donald T. Rowe, Jr., Bigham, Englar, Jones & Houston, New York City, of counsel), for amicus curiae American Institute of Marine Underwriters.

Before CARDAMONE and PIERCE, Circuit Judges, and BONSAL, Senior District Judge.[*]

PIERCE, Circuit Judge:

These appeals are from a final judgment filed in the United States District Court for the Southern District of New York on April 28, 1986, following a bench trial before Judge Robert L. Carter. The judgment (1) awarded plaintiff-appellee The Ingersoll Milling Machine Co. ("Ingersoll") damages and prejudgment interest against defendants-appellants Taiwan International Line Ltd. ("Taiwan"), J.E. Bernard & Co. ("Bernard"), and Fireman's Fund Insurance Co. ("Fireman's Fund" or the "Fund") jointly and severally, (2) awarded Ingersoll attorney's fees and litigation expenses against Fireman's Fund, (3) awarded Fireman's Fund a right of subrogation against Taiwan and Bernard, and (4) dismissed claims of Taiwan and Bernard against each other.

Ingersoll cross-appeals seeking to increase its award of damages and prejudgment interest.

Appellants each raise a number of issues on appeal. We consider them seriatim, and we affirm the determinations of the district court except with regard to the award of attorney's fees and litigation expenses.

## BACKGROUND

This case arises from the shipment of certain cargo from the United States to South Korea. The cargo, which was insured, and consisted of 20 packages, 18 of which were stowed on the deck of the ship, was damaged in transit. Simply stated, we must determine whether the district court properly decided who is responsible for the damage and that the insurer improperly refused to cover the loss. We set forth the essential evidence in this section, as found by the district court, 619 F.Supp. 493 (S.D.N.Y.1985), with details to be provided later as necessary.

In January 1978, Waldrich Siegen, GmbH ("Waldrich") of West Germany contracted to sell heavy, specially designed machines to Hyundai International, Inc., in Korea. Waldrich engaged its affiliate, Ingersoll, a manufacturer of special design machinery, as a subcontractor to manufacture Shop Order 24441 ("Order # 24441") and to arrange for its shipment to Korea. Order # 24441 consisted of a ram type, horizontal spindle, traveling column machinery center, and was valued in excess of $2 million.

In the summer of 1979, Ingersoll, located in Rockford, Illinois, contacted Gryphon Shipping Service, Inc. ("Gryphon"), a broker and steamship agent in Chicago, to arrange for shipment of Order # 24441 to

---

[*] Honorable Dudley B. Bonsal, Senior District Judge, United States District Court for the Southern District of New York, sitting by designation.

Korea.[1] Gryphon, in turn, contacted Taiwan, which had time chartered the M/V Bodena from its owner Excellent Marine, Inc. ("Excellent Marine"). Gryphon arranged with Taiwan in August 1979 for the cargo to be shipped in September 1979 from New Orleans aboard the M/V Bodena. A contract of carriage arose between Ingersoll and Taiwan in August 1979 when Ingersoll accepted the terms arranged by Gryphon and informed Gryphon that the shipment of Order #24441 would be in twenty boxes. The district court found that, at the time of booking, there was no evidence that Ingersoll had agreed to on deck stowage. Gryphon's commission was to be paid by Taiwan, and Gryphon was found by the district court to be Taiwan's agent.

In connection with the shipment, Ingersoll also retained Bernard, a freight forwarder doing business in Elk Grove Village, Illinois, to perform various freight forwarding tasks. In addition to other duties to be performed by Bernard, Ingersoll, by letter dated September 10, 1979, requested that Bernard secure "three originals and four copies of *clean* on-board bills of lading" (emphasis added). In response to this letter, Bernard prepared two master ditto forms of the bill of lading and also the shipper's export declaration. One of the master ditto forms was sent to Mid-Gulf Shipping, Inc. ("Mid-Gulf"), Taiwan's agent in New Orleans, to be used in the preparation of the original bills of lading; the other was sent to Gryphon. In addition, the master ditto was used to prepare an advance notice of shipment which was sent by Bernard to Ingersoll on September 25, 1979. Neither the master ditto nor the advance notice contained any notation as to stowage. Ingersoll informed Bernard that all the information on the advance notice was correct except that the port of discharge should be changed.

The Ingersoll cargo, which had arrived in New Orleans from Illinois by truck and rail, was loaded on board the M/V Bodena on September 26 and 27, 1979. Of the twenty boxes which comprised Order #24441, eighteen were initially stowed on deck and two were stowed below deck. Mid-Gulf, Taiwan's agent, was responsible for the issuance of bills of lading. Prior to sailing, Mid-Gulf took the ditto form supplied by Bernard and added the phrase "on deck shipper's risk" to its face. Mid-Gulf then used the altered ditto to run off three original bills of lading and mailed the originals with thirteen copies to Gryphon in Chicago.

Ingersoll received the originals and four copies on October 1, 1979. Fred Woywod, Ingersoll's contract administrator, saw the documents that day but either did not notice the addition of the words "on deck shipper's risk" or if he did notice them, did not understand their legal significance. Bernard, too, received copies of the bills of lading on October 1 but failed to examine the issued bills to determine whether they were in fact clean, and, consequently, failed to inform Ingersoll that Taiwan had not followed the instructions to issue clean bills of lading.

The M/V Bodena, which had made several intermediate stops at various East Coast ports, set sail from Savannah, Georgia, for Korea on October 14, 1979. At the time of sailing, seventeen of Ingersoll's boxes were stowed on deck, one of the boxes initially stowed on deck having been moved below deck. The voyage to Korea lasted more than one month and was beset with storms, heavy seas, and high winds. As a result of heavy rolling and pitching during the voyage, the seventeen boxes on the deck were severely damaged. Some boxes were broken; others were thoroughly soaked by sea water. Because of the damage, Order #24441 had to be sent from Korea to Waldrich in Germany for repair. None of the three boxes stowed under deck was damaged.

Ingersoll maintained an all risk insurance policy with Fireman's Fund. That policy had been issued as an open cargo policy, designed to cover all of Ingersoll's shipments. In other words, a particular shipment would become covered under the poli-

---

1. Gryphon is not a party to this action.

cy either when Ingersoll filled out and sent to Fireman's Fund a certificate of insurance for each shipment, indicating the contents, value, destination, and carrier of the cargo, or when Ingersoll sent to the Fund a monthly declaration of shipments. As testified to by Fireman's Fund officials, such a policy was designed to provide automatic coverage such that even if the certificate or monthly declaration was sent after a loss had occurred, the shipment would nevertheless be covered.

The particular policy in question contained separate clauses for insuring under deck shipments and on deck shipments.[2] Clause 17(a) insured under deck shipments and specifically contained broader terms of coverage. Those terms provided coverage against all risks of physical loss or damage. Clause 17(b), which did not contain broader terms, provided coverage for on deck shipments known as free of particular average ("FPA"). FPA coverage does not cover a partial loss of the subject matter insured unless certain contingencies not relevant herein occur. Another provision of the policy, clause 8(B)(2), limited coverage to $175,000 for shipments subject to an on deck bill of lading or shipments stowed on deck with the consent of the insured.[3]

In August 1979, Ingersoll sent to Fireman's Fund a certificate of insurance to cover Order #24441. The certificate, which took effect before the boxes were actually loaded aboard the M/V Bodena, stated that the machinery was laden under deck. When Ingersoll learned of the damage to the cargo in December 1979, it notified Fireman's Fund of its loss. After an investigation, Fireman's Fund, on May 23, 1980, denied Ingersoll's claim under its policy for full indemnity for the repairs undertaken by Ingersoll.

The district court found that Taiwan and Bernard were jointly and severally liable for Ingersoll's damages, and accordingly, awarded Ingersoll $977,899 plus prejudgment interest. Fireman's Fund too was found jointly and severally liable to Ingersoll in the same amount under the insurance policy; and it was ordered that to the extent that Fireman's Fund makes payment to Ingersoll for damages assessed, it will be entitled to recover such payment from Taiwan and Bernard, including taxable costs but not including attorney's fees and litigation expenses. Additionally, the district judge ruled that Ingersoll was enti-

---

2. The pertinent provisions of the policy are set forth below in full:

 17. (a) UNDER DECK shipments—Including containerized shipments under optional On Deck & /Or Under Deck bill(s) of lading are insured. Warranted free from Particular Average unless the vessel or craft be stranded, sunk, or burnt, but notwithstanding this warranty this Company is to pay any loss of or damage to the interest insured which may reasonably be attributed to fire, collision or contact of the vessel and/or craft and/or conveyance with any external substance (ice included) other than water, or to discharge of cargo at port of distress. *The foregoing warranty, however, shall not apply where broader terms of Average are provided for hereinafter.*
 BROADER TERMS:—
 Insured against all risks of physical loss or damage from any external cause irrespective of percentage, including theft, pilferage and/or non-delivery, but excluding, nevertheless, the risks of war, strikes, riots, seizure, detainment, confiscation, requisition, nationalization and other risks excluded by the "F.C. & S. and/or S.R. & C.C." warranties in the printed portion of the policy except to the extent that such risks may be specifically covered by endorsement, also warranted free

 from any claims arising out of the inherent vice of the goods insured or consequent upon loss of time and/or market.
 (b) ON DECK shipments are insured:—
 Warranted free of particular average unless caused by the vessel and/or interest insured being stranded, sunk, burnt, on fire or in collision with another ship or vessel or with ice or with any substance other than water, but liable for jettison and/or washing overboard, irrespective of percentage. *The foregoing warranty, however, shall not apply when broader terms of Average are provided for hereinafter.*
 BROADER TERMS:—[None provided]
 Fireman's Fund Insurance Company, Marine Open Cargo Policy No. WB 20737, (italics in original), *also quoted in* 619 F.Supp. 493, 498–99 (S.D.N.Y.1985).

3. Clause 8(B)(2) reads in full as follows:

 B. Of the limit of liability expressed above, this Company shall not be liable for more than
 . . . .
 (2) *$175,000.00* in respect of cargo shipped subject to On Deck ocean bill(s) of lading or stowed On Deck with consent of the Assured.

tled to recover attorney's fees and litigation expenses from Fireman's Fund. Finally, the district court dismissed the claims of Taiwan and Bernard against each other, as well as Ingersoll's claim against Excellent Marine. This appeal followed.

## DISCUSSION

### I. TAIWAN

Ingersoll's claim against Taiwan can be characterized simply as a claim for breach of contract. There is no dispute that a contract of carriage existed between Ingersoll and Taiwan. Telephone conversations in August 1979 between representatives of Ingersoll, Gryphon, and Taiwan, in which the cargo was booked, led to a binding contract when Ingersoll informed Gryphon that it accepted Taiwan's terms. As the district court found, this contract constituted the contract of carriage. The open question then was what were the terms of the contract. More specifically, did the contract call for on deck or below deck stowage.

■ Absent an express agreement by the shipper permitting cargo to be stowed on deck or a general port custom permitting on deck stowage, a shipper is entitled to expect below deck stowage under a clean bill of lading. *St. Johns N.F. Shipping Corp. v. S.A. Companhia Geral Commercial Do Rio De Janeiro*, 263 U.S. 119, 123–24, 44 S.Ct. 30, 30–31, 68 L.Ed. 201 (1923); *English Elec. Valve Co. v. M/V Hoegh Mallard*, 814 F.2d 84, 89 (2d Cir. 1987); *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7, 14 & n. 5 (2d Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); *accord Calmaquip Eng'g West Hemisphere Corp. v. West Coast Carriers Ltd.*, 650 F.2d 633, 639 (5th Cir. Unit B 1981); *see* 2A E. Benedict, *Benedict on Admiralty* § 123, at 12–11 (7th ed. 1987) ("[g]oods stowed on deck without the shipper's consent are at the ship's risk, the shipowner being liable for any loss or damage thereto.") To reiterate, a shipper's reasonable expectation on booking cargo for shipment is that it will be stowed below deck, unless the shipper agrees to the contrary or a general port custom permits above deck stowage. The burden is on the carrier to prove that the shipper consented to something other than the usual and customary arrangement. *See Gemini Navigation, Inc. v. Philipp Bros. Div. of Minerals & Chemicals Philipp Corp.*, 499 F.2d 745, 751 (2d Cir.1974).

■ Although the district court found that "[t]here is no evidence that Ingersoll specified below deck stowage," 619 F.Supp. at 500, it also found that "there is no credible evidence that Ingersoll agreed to an on deck shipment," *id.* Thus, the terms of the contract of carriage were established by the industry custom that stowage would be below deck. The district court correctly found that Taiwan had failed to meet its burden of proof that Ingersoll agreed to on deck stowage and that Taiwan was liable for not performing its contract obligations.

■ Taiwan presents a number of arguments in support of its contention that it is not liable for breach of contract.[4] First, Taiwan argues that Ingersoll waived its right to below deck stowage of its cargo. Specifically, Taiwan claims that by receiving the bill of lading on October 1, 1979, with the notation "on deck shipper's risk," Ingersoll had constructive notice that its goods had been stowed on deck. Therefore, Taiwan argues, Ingersoll had a duty to notify Taiwan that on deck stowage was unacceptable so that Taiwan could have either shifted the cargo to a below deck location or unloaded the cargo at another port of call at which the M/V Bodena docked prior to embarking for Korea on October 14, 1979.

The district court did indeed find that Ingersoll had constructive notice that its goods were being carried on the deck of

---

4. Taiwan's argument that the district court improperly interpreted the meaning of "clean" on board bills of lading is not relevant. The contract of carriage between Ingersoll and Taiwan was formed in August 1979 when the cargo was booked. It did not contain any reference to bills of lading. Interpretation of the meaning of "clean" bills of lading is relevant only in assessing Ingersoll's claims against Bernard. See *infra* section IIB.

the M/V Bodena at Ingersoll's risk. 619 F.Supp. at 501. However, a party asserting a waiver defense bears the burden of proof in establishing that defense. Taiwan, in our view, cannot make out a defense of waiver. Waiver is generally defined as an intentional relinquishment of a known right. *Shearson Hayden Stone, Inc. v. Leach*, 583 F.2d 367, 370 (7th Cir. 1978); *Fustok v. Conticommodity Services, Inc.*, 577 F.Supp. 852, 859 (S.D.N.Y. 1984). *See generally* 5 S. Williston, *A Treatise on the Law of Contracts* § 678 (3d ed. 1961). An intent to waive a contractual right must be manifest in a party's failure to object. *See Saverslak v. Davis-Cleaver Produce Co.*, 606 F.2d 208, 213 (7th Cir.1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 762 (1980).

Ingersoll's contract with Taiwan, as the district court interpreted it, called for under deck stowage. We find no basis in the record upon which to conclude that Ingersoll intentionally relinquished its right to under deck stowage. Ingersoll's silence after receiving constructive notice of the on deck shipment lacks the requisite manifest intent to constitute a waiver. Ingersoll's silence and failure to act can better be characterized as an oversight or carelessness rather than as a waiver of a contractual right. The mere fact that Ingersoll can be deemed to have been informed that its machinery was being shipped to Korea on deck does not mean that the conclusion must be drawn that it knowingly consented to a modification of the original contract.

■ Next, Taiwan contends that Gryphon was Ingersoll's agent and therefore that Ingersoll was bound by the contracts entered into by Gryphon. Taiwan claims that if Gryphon was aware during booking that Order # 24441 was going to be shipped on deck, Ingersoll would be bound by that knowledge. However, the district court specifically found that Gryphon was Taiwan's agent.[5] This finding may not be reversed unless clearly erroneous. *O'Connell Mach. Co. v. M.V. "Americana"*, 797 F.2d 1130, 1133 (2d Cir.1986). It appears that there is sufficient evidence in the record to support this finding. For instance, Gryphon paid Bernard its brokerage commission on Taiwan's behalf. Bernard also sent a copy of the master ditto bill of lading to Gryphon to prepare the bill of lading, which Gryphon would be likely to do if it was Taiwan's agent. Moreover, Taiwan paid Gryphon a finder's fee for obtaining the Ingersoll cargo for Taiwan.

■ Taiwan also contends that even if the initial oral contract called for below deck stowage, Ingersoll's receipt of the bill of lading with the new terms changed the parties' obligations. As Taiwan would have it, only the bill of lading, even if it contains unauthorized terms, represents the contract of carriage. In other words, Taiwan contends it is solely the bill of lading which governs and determines the proper stowage of the cargo. While it is true that a bill of lading may under certain circumstances constitute the contract of carriage between the parties, *see CIA. Platamon de Navegacion, S.A. v. Empresa Colombiana de Petroleos*, 478 F.Supp. 66, 67 (S.D.N.Y.1979); *see generally* 2A *Benedict on Admiralty* § 34, at 4–13, Taiwan's argument is not at all persuasive on the evidence in this case. A carrier such as Taiwan may not unilaterally alter a bill of lading so as to bind the shipper without the authorization of the shipper. *See West India Indus. v. Tradex, Tradex Petroleum Services*, 664 F.2d 946, 949–50 & n. 5 (5th Cir.1981). A carrier cannot impose on deck stowage on a shipper merely by including a notation in the bill of lading which it delivers after the voyage commences. To allow

5. Taiwan asserts that the agency issue had already been decided in a related action in the Northern District of Illinois. *Ingersoll Mill. Mach. Co. v. J.E. Bernard & Co.*, 508 F.Supp. 907 (N.D.Ill.1981). However, that court concluded only that Gryphon was more likely Ingersoll's agent than Taiwan's. *Id.* at 912. Moreover, the district judge was not bound by that decision because it was rendered on a motion to dismiss for lack of jurisdiction before discovery, and without the benefit of testimony and the emergence of all the evidence. We do not believe the issue had been fully and fairly litigated so as to preclude the district judge from making his own independent finding. *Saylor v. Lindsley*, 391 F.2d 965, 968 (2d Cir.1968); *see also Saez Rivera v. Nissan Mfg. Co.*, 788 F.2d 819, 821 (1st Cir. 1986).

a carrier after the fact to impose on the shipper an unauthorized change of terms would run counter to the general proposition that without its contrary agreement, a shipper is entitled to expect below deck stowage. *See St. Johns N.F. Shipping Corp.*, 263 U.S. at 124, 44 S.Ct. at 30; *Encyclopaedia Britannica, Inc.*, 422 F.2d at 14 & n. 5. Under the circumstances presented herein, the contract of carriage which governed the obligations of Ingersoll and Taiwan was the one orally entered into in August 1979 and not the altered bill of lading.

Finally, Taiwan argues that Ingersoll had the burden of showing that the damage was caused by Taiwan's negligence and, in any case, that its liability should be limited to $500 per package pursuant to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1300 *et seq.* (1982 & Supp.1983), which the bill of lading incorporated by reference. We reject both of these contentions. First, as shown above, Taiwan's stowage of Ingersoll's cargo on deck without Ingersoll's permission was a breach of the contract of carriage. A showing that Taiwan was negligent by such stowage is not relevant to or necessary for establishing a breach of contract. Second, where, as here, a carrier has materially deviated from the terms of the contract of carriage, monetary limits contained in COGSA and in bills of lading are inapplicable; rather, the carrier is liable in full as an insurer of the cargo. *General Elec. Co. Int'l Sales Div. v. S.S. Nancy Lykes*, 706 F.2d 80, 87 (2d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); *Calmaquip Eng'g West Hemisphere Corp.*, 650 F.2d at 638–39; *Encyclopaedia Britannica, Inc.*, 422 F.2d at 18. Therefore, because Ingersoll's cargo was stowed on deck in breach of the contract of carriage, Ingersoll's recovery is not contingent upon a showing of negligence, and Taiwan cannot benefit from the limits of liability in the bill of lading or in COGSA.

## II. BERNARD

### A. *Admiralty Jurisdiction*

As a preliminary matter, Bernard challenges the district court's assertion of subject matter jurisdiction. Since there does not appear to be diversity or federal question jurisdiction, subject matter jurisdiction must reside, if at all, under 28 U.S.C. § 1333, which provides for admiralty or maritime jurisdiction in the federal courts. Bernard, seeking to avoid the application of admiralty jurisdiction, characterizes its contract with Ingersoll as one for preliminary brokerage services only incidentally related to the maritime contract between Ingersoll and Taiwan. The district court, after observing that "[f]ederal courts have traditionally exercised admiralty jurisdiction over shipper's claims against freight forwarders," 619 F.Supp. at 503, held that the services Bernard performed were not preliminary in nature. While we decline to lay down a general rule that freight forwarders are always subject to admiralty jurisdiction, we do hold, for reasons discussed below, that in this instance, Bernard's freight forwarding contract with Ingersoll involved enough tasks of a non-preliminary nature to support admiralty jurisdiction.

We have recognized that "[t]he precise categorization of the contracts that warrant invocation of the federal courts' admiralty jurisdiction has proven particularly elusive." *CTI–Container Leasing Corp. v. Oceanic Operations Corp.*, 682 F.2d 377, 379 (2d Cir.1982). The Supreme Court has cautioned that "[t]he boundaries of admiralty jurisdiction over contracts—as opposed to torts or crimes—being conceptual rather than spatial, have always been difficult to draw." *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961). A long-recognized principle for determining whether a contract is maritime is that agreements preliminary to maritime contracts are not cognizable in admiralty. *Peralta Shipping Corp. v. Smith & Johnson (Shipping) Corp.*, 739 F.2d 798, 801 (2d Cir.1984), *cert. denied*, 470 U.S. 1031, 105 S.Ct. 1405, 84 L.Ed.2d 791 (1985); 1 *Benedict on Admiralty* § 184, at 11–8 (7th ed. 1985). Applying this principle, our Court, despite questioning its continuing validity, has recently affirmed

the longstanding, well settled rule laid down by the Supreme Court in *Minturn v. Maynard,* 58 U.S. (17 How.) 477, 15 L.Ed. 235 (1854), that general agency contracts are not cognizable in admiralty. *Peralta Shipping,* 739 F.2d at 804. General agency contracts are those that call for the "husbanding" of a vessel, that is, arranging for performance of a variety of services preliminary to maritime contracts, such as soliciting cargo or passengers, and procuring supplies, crews, stevedores, and tugboats. Thus, in *Peralta Shipping,* this Court held that a contract which included a duty to supervise the performance of maritime contracts did not warrant admiralty jurisdiction. *Id.* at 803.

■■■ Bernard argues that freight forwarding contracts fall within the ambit of general agency contracts and are therefore excluded from admiralty consideration. Courts that have specifically dealt with admiralty jurisdiction over freight forwarders appear to have arrived at different conclusions. *Compare Outbound Maritime Corp. v. P.T. Indonesian Consortium of Constr. Indus.,* 575 F.Supp. 1222, 1223–24 (S.D.N.Y.1983) (freight forwarder subject to admiralty jurisdiction) *with Johnson Products Co. v. M/V La Molinera,* 619 F.Supp. 764, 767 (S.D.N.Y.1985) (freight forwarder not subject to admiralty jurisdiction). However, the focus of our inquiry must be not on the name assigned to the contract, but rather on the nature of the services to be performed. It is the character of the work to be performed under the contract that is determinative of whether the agreement was maritime. *Hinkins S.S. Agency, Inc. v. Freighters, Inc.,* 498 F.2d 411, 412 (9th Cir.1974); *see also North Pac. S.S. Co. v. Hill Bros. Marine Ry. & Shipbld. Co.,* 249 U.S. 119, 125, 39 S.Ct. 221, 222, 63 L.Ed. 510 (1919); *James Richardson & Sons v. Conners Marine Co.,* 141 F.2d 226, 228 (2d Cir.1944). If the subject matter of the contract " 'relat[es] to a ship in its use as such, or to commerce or to navigation on navigable waters, or to transportation by sea or to maritime employment' " it is fairly said to constitute a maritime contract. *CTI–Container Leasing Corp.,* 682 F.2d at 379 (quoting 1 *Benedict on Admiralty* § 183, at 11–6 (7th ed. 1981)). Accordingly, we turn to an examination of the services to be performed by Bernard under its contract with Ingersoll.

Of the thirteen services listed by the Federal Maritime Commission which a freight forwarder may perform at the request of a shipper, 46 C.F.R. § 510.2(h), Ingersoll asked Bernard to undertake six. Bernard was obligated to prepare and process export declarations; to prepare and process delivery orders or dock receipts; to prepare and process ocean bills of lading, including the preparation and forwarding of a master ditto; to prepare and send advance notification of shipments or other documents to banks, shippers, or consignees; to handle freight or other monies advanced by the shipper or to remit or advance freight or other monies or credit in connection with the dispatching of shipments; and together with Ingersoll, to coordinate the movement of shipments from origin to vessel.

Although Bernard's services may not have included *all* the services a freight forwarder traditionally performs for a shipper, it is not upon the number of services that we focus but rather on their nature. The preparation and processing of export declarations, delivery orders, dock receipts, bills of lading, and advance notification of shipment are not services rendered preliminary to a voyage rather they are essential to it. Without these, there can be no voyage. Specifically, we note that the district court found that Bernard's obligation with regard to the bills of lading was twofold. First, Bernard was engaged to *secure* clean on board bills of lading. Additionally, on receipt of the bills of lading, Bernard was to *review* the copies it received and to *advise* Ingersoll if in fact they were not clean. 619 F.Supp. at 502. Bernard's duty to secure clean bills of lading is akin to the issuance of bills of lading themselves. An obligation to procure a bill of lading for an ocean shipment, in our view, is a contract relating to transportation by sea. The procurement of the proper papers and documents relating to a shipment by sea is an essential and integral part of the shipping

process; a contract to obtain those papers, therefore, falls squarely within the admiralty jurisdiction of the federal courts.

Bernard relies heavily on *Johnson Products,* which held that the forwarding of a bill of lading does not in itself create a maritime contract. We believe that *Johnson Products* is distinguishable from this case. In that case, the obligation of the freight forwarder was merely to pass along the bill of lading that was issued by the carrier. 619 F.Supp. at 767. Herein, Bernard's obligation to Ingersoll was to do more than merely transfer documents. Bernard had an affirmative obligation to *secure* clean bills. Its responsibilities did not begin when the completed bills of lading first arrived on its desk. Bernard was engaged to ensure that Ingersoll's cargo would be properly loaded on board the M/V Bodena so that the proper bills of lading would be issued. Thus, having undertaken to arrange for the proper loading of the cargo onto the vessel, as well as other tasks of a nonpreliminary nature, we conclude that Bernard's contract with Ingersoll can fairly be characterized as a maritime contract supportive of admiralty jurisdiction.

#### B. *Breach of Contract*

Bernard's contract with Ingersoll called for Bernard to perform a number of services typically associated with a general freight forwarder. Bernard's contention that its duties were more limited in scope than those generally performed by freight forwarders is not pivotal in determining whether Bernard breached its contract with Ingersoll. Our focus must be on the specific obligations involved and whether Bernard satisfactorily performed them. As noted, the district court found that two of the tasks to be performed by Bernard related to the bills of lading. Bernard was bound initially to secure clean on board bills of lading for Ingersoll. Moreover, Bernard was bound to examine the bills of lading once they had been issued by Taiwan and to inform Ingersoll of any imperfections. The district court held that Ber-

nard failed in both respects: it failed in its obligation to procure clean bills, and it failed to examine the copies it received and to advise Ingersoll that in fact they were not clean. 619 F.Supp. at 502. We find no clear error in the district court's finding that Bernard failed in its primary duty, namely, to supply the clean bills. We therefore find it unnecessary to reach the secondary question, whether Bernard also failed to review the bills for imperfections.

#### 1. *"Clean" on Board Bills of Lading*

Bernard contends that the bills of lading that it supplied were in fact clean. According to Bernard, the notation of the words "on deck shipper's risk" did not render the bills unclean. In Bernard's view, a "clean" bill of lading requires only that the shipping document bear no notation on its face that expressly declares a defective condition of the goods. In other words, it contends, a "clean" bill of lading indicates that the goods were not received by the carrier in damaged condition at the time of shipment. The phrase "on deck shipper's risk," Bernard argues, is a clause which does not describe the physical condition of the goods at the time of receipt by the carrier, but rather relates instead to who bears the risk during voyage. So interpreted, a notation declaring that the shipper bears the risk of damage during the voyage would not affect the cleanliness of the bills. We disagree with Bernard's interpretation.

It is no doubt true, as Bernard claims, that a "clean" bill of lading refers to the undamaged condition of the cargo at the time it is received by the carrier. *Vana Trading Co. v. S.S. "Mette Skou",* 556 F.2d 100, 103 n. 4 (2d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); C. Gilmore & C. Black, *The Law of Admiralty* § 3–13, at 122 (2d ed. 1975). However, a "clean" bill of lading refers to more than just the condition of the goods. It has long been recognized in admiralty custom and practice that a "clean" bill of lading refers also to the place on a ship where cargo is to be

stowed.[6] "[A] clean bill of lading imports that the goods are to be safely and properly stowed *under deck." The Delaware*, 81 U.S. (14 Wall.) 579, 602, 20 L.Ed. 779 (1871) (emphasis added); *see Seguros Banvenez, S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 859 (2d Cir.1985). Noted admiralty commentators agree that a "clean" bill of lading denotes a bill that is either silent as to stowage, thereby imputing that the cargo is to be stowed below deck, or provides for under deck stowage. 2A *Benedict on Admiralty* § 97, at 9–12 (7th ed. 1987) ("[t]he issuance of a clean bill of lading—one which does not specifically provide for on-deck stowage—obligates the carrier to stow the cargo under deck"); *id.* § 123, at 12–10 ("[a] clean bill of lading imputes under-deck stowage"); A. Knauth, *Ocean Bills of Lading* 237 (2d ed. 1941) ("[a] 'clean' bill of lading is an unwritten representation that the cargo would be carried under deck"). Thus, when a shipper requests a "clean" bill of lading it expects to receive from the carrier a document which either specifically notes that stowage is under deck, *see Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 59 (2d Cir.1985), or is silent as to stowage, *see The Idefjord*, 114 F.2d 262, 266 (2d Cir.), *cert. denied*, 311 U.S. 707, 61 S.Ct. 175, 85 L.Ed. 459 (1940). If the document is silent as to stowage, the assumption is that the goods have been stowed below deck. In other words, a request for a "clean" bill of lading is an implied request for stowage below deck.

Ingersoll's instruction to Bernard in its letter of September 10, 1979, was to provide "clean" on board bills of lading. Bernard, therefore, was duty bound to supply bills that noted or implied that stowage was below deck. Contrary to Ingersoll's instruction, the bills actually provided by Bernard contained a notation indicating that the goods had been stowed on deck. Thus, Bernard plainly breached its contract with Ingersoll.

## 2. *Causation*

■ Bernard also contends that even if it failed to supply "clean" bills of lading to Ingersoll, its breach of contract was not causally connected to the damage to Order # 24441. Essentially, Bernard argues that even if it had reviewed the bills and found the notation, the damage to the cargo would still have occurred. By the time the notation was detected, the cargo was already on deck and at sea. Therefore, according to Bernard, its failure to advise Ingersoll that the bills bore the clause "on deck" did not cause or contribute to the damage.

Bernard's contention might have some merit were its only contractual duty to review the bills after they had been issued. In such case, given that Bernard received the documents on October 1 and that the M/V Bodena did not actually leave the United States bound for Korea until October 14, the feasibility of unloading the cargo at another U.S. port prior to sailing would be a crucial issue. The district court did not decide whether unloading was a viable option because of a dearth of evidence. 619 F.Supp. at 502. However, the question of whether the cargo could have somehow been saved between October 1 and October 14 is not determinative of Bernard's liability. Bernard's contractual obligation was not only to review the bills of lading for defects but also to secure clean bills in the first instance. Having failed to ensure that the cargo was placed below deck, thereby breaching its contract by causing a bill that was not "clean" to be issued, Bernard can be said to have proximately caused Ingersoll's damages.

We reject Bernard's contention that all it was obligated to do was to transmit faithfully to Taiwan Ingersoll's request for "clean" bills of lading, and once having relayed those instructions, to transfer the issued documents upon receipt to Ingersoll.

---

**6.** The meaning of a "clean" bill of lading is one firmly established by the custom and practice of the maritime industry. Its meaning is not ambiguous, and, therefore, the parties' intention in using that term does not govern, as Bernard argues it should. The district court properly did not employ contractual rules of construction, such as the intent of the parties at the time of contracting, in interpreting its meaning.

It is reasonable to assume that the hiring of Bernard as a freight forwarder contemplated not simply the handling of documents and the removal of any markings which would render the bills unclean should such markings appear; rather, Bernard was retained to ensure in advance that proper documents would be provided. It was Bernard's responsibility to see that Ingersoll received the requested documents and thus to assure the safe journey Ingersoll anticipated as a result of its request. Bernard did not take preventive or corrective action to ensure this result. Bernard should have monitored the loading process in New Orleans to assure that the proper bills could be issued. Its failure to do so was a breach of contract resulting in damages to Ingersoll.

### III. CROSS–CLAIMS OF TAIWAN AND BERNARD

The district court properly dismissed the claims asserted by Taiwan and Bernard for indemnity against each other. Indemnity rests upon the principle that the true wrongdoer should bear the ultimate burden of payment. *Ross v. Penn Cent. Transp. Co.*, 433 F.Supp. 306, 309 (W.D. N.Y.1977). There can be no indemnity as between parties that each bear primary responsibility for a wrong regardless of their relative degrees of fault. *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 318 (3d Cir.), *cert. denied*, 474 U.S. 980, 106 S.Ct. 384, 88 L.Ed.2d 337 (1985). Having concluded that Taiwan and Bernard each breached their separate contracts with Ingersoll, the district court properly held them jointly and severally liable and dismissed their respective claims for indemnity.

### IV. FIREMAN'S FUND

A. *Liability on the Policy*

Fireman's Fund contends that the district court erred in finding that Ingersoll's policy covered the damage sustained by Order # 24441. Essentially, the Fund contends on appeal that clause 17(b) of the policy, which denies coverage for partial loss of on deck shipments, should apply to deny coverage because part of Ingersoll's cargo was actually stowed on deck. We disagree. As we discuss below, the district court was justified in finding the policy ambiguous, construing it against Fireman's Fund, and applying clause 17(a) of the policy, which covers all risks of loss in cases of under deck shipments.

Ingersoll's policy with Fireman's Fund was an open cargo policy. Such a policy is a master policy which covers all of an insured's shipments. An insured declares a particular shipment either by sending the Fund a copy of an insurance certificate or a monthly declaration of shipments. One of the advantages of this type of policy is that an insured has automatic coverage for a shipment even if it neglects to declare the shipment, or if the certificate is not issued until the cargo has arrived and a loss has already occurred. Under the subject policy, different types of shipments were accorded different types of coverage. Certain shipments were insured on an all risk basis (clause 17(a)), that is, against all risks of physical loss or damage from any external cause; other types of shipments were insured free of particular average (clause 17(b)), that is, partial losses were not covered; still others were subject to monetary limits (clause 8(B)(2)).

In August 1979, before shipping Order # 24441, Ingersoll sent Fireman's Fund an insurance certificate to declare and insure the machine. The certificate stated that the goods were stowed under deck and were insured against all risks. The certificate became effective on August 31, 1979. In fact, the bulk of the shipment was stowed on deck and the bill of lading was marked "on deck shipper's risk" without Ingersoll's consent. Ingersoll notified Fireman's Fund of the damage to the cargo in December 1979. The Fund denied Ingersoll's claim by letter dated May 23, 1980.

Marine insurance contracts are governed by federal admiralty law when there is an established federal rule, and by state law when there is not. *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 313–14, 75 S.Ct. 368, 370–71, 99

L.Ed. 337 (1955); *Ionian Shipping Co. v. British Law Ins. Co.*, 426 F.2d 186, 190 (2d Cir.1970). The parties do not dispute that to the extent that federal admiralty rules do not exist, the interpretation of the policy is governed by Illinois law.

■ The starting point in interpreting an insurance policy is to determine whether the policy terms are ambiguous. As a general rule, plain or unambiguous language will be given its ordinary meaning and effect, and the need to resort to rules of construction arises only when an ambiguity exists. *National Fidelity Life Ins. Co. v. Karaganis*, 811 F.2d 357, 361 (7th Cir.1987); *Chicago Bd. Options Exch., Inc. v. Connecticut Gen. Life Ins. Co.*, 713 F.2d 254, 257–58 (7th Cir.1983). Courts may not create an ambiguity where none exists. *Simmons Refining Co. v. Royal-Globe Ins. Co.*, 543 F.2d 1195, 1197 (7th Cir.1976); *State Farm Mut. Auto. Ins. Co. v. Berke*, 123 Ill.App.2d 455, 258 N.E.2d 838, 841 (1970). If an insurance contract is ambiguous it will generally be construed against the insurer who drafted it in order to promote coverage for losses to which the policy relates. *Karaganis*, 811 F.2d at 361; *FSC Paper Corp. v. Sun Ins. Co. of N.Y.*, 744 F.2d 1279, 1282 (7th Cir.1984). This principle applies to all types of insurance policies including maritime policies. *Kalmbach, Inc. v. Insurance Co. of Pa.*, 529 F.2d 552, 555 (9th Cir.1976) (citing Illinois cases). The rule that insurance policies are to be construed in favor of the insured is most rigorously applied in construing the meaning of exclusions incorporated into a policy of insurance or provisions seeking to narrow the insurer's liability. *Sears, Roebuck & Co. v. Reliance Ins. Co.*, 654 F.2d 494, 499 (7th Cir.1981). Accordingly, we

turn first to the question of whether Ingersoll's policy is ambiguous.

■ Fireman's Fund's argument that the policy provisions are unambiguous has surface appeal. Clause 17(a) is encaptioned "UNDER DECK shipments" and clause 17(b) is encaptioned "ON DECK shipments." At first glance, these captions would seem to indicate that it is the actual, physical place of stowage which governs the applicability of the clauses. Cargo actually stowed under deck would be governed by clause 17(a), and cargo actually stowed on deck would fall within clause 17(b). However, a closer, more careful reading of the policy reveals that the provisions at issue are in fact ambiguous.[7]

Looking at the insurance contract as a whole, as we must, *Michigan Chem. Corp. v. American Home Assurance Co.*, 728 F.2d 374, 377 (6th Cir.1984) (applying Illinois law), we find clauses 17(a) and 17(b) subject to varying interpretations. A contract that is reasonably and fairly susceptible of more than one meaning is said to be ambiguous. *Karaganis*, 811 F.2d at 361; *Sunstream Jet Express, Inc. v. International Air Serv. Co.*, 734 F.2d 1258, 1269 (7th Cir.1984). Neither clause 17(a) or 17(b) makes reference on its face to the bills of lading or to the contract of carriage under which the shipments were to travel.[8] Nor do clauses 17(a) or 17(b) refer to the consent of the insured in deciding where its cargo is to be placed. However, another provision of the policy, clause 8(B)(2), specifically places a monetary ceiling on shipments that travel either "subject to On Deck ocean bill(s) of lading" or are "stowed On Deck with consent of the Assured." Where one part of the policy is specific and another general, it is incumbent upon the court to resolve the question of what rela-

---

**7.** Fireman's Fund contends that the district court improperly considered parol evidence (testimony of Fund officials to the effect that cargo on deck without the insured's consent but with an under deck bill of lading would be covered by clause 17(a)) in finding an ambiguity in the policy. We disagree. As explained, the district court could properly have found the policy ambiguous on its face. Moreover, under Illinois law, "[i]n determining whether an ambiguity exists, as a matter of law, the trial court may consider parol and extrinsic evidence."

*Sunstream Jet Express, Inc. v. International Air Serv. Co.*, 734 F.2d 1258, 1268 (7th Cir.1984) (citing cases).

**8.** Clause 17(a) does refer to the bills of lading under which *containerized* shipments travel. It does not, however, mention bills of lading with regard to other types of shipments. Mentioning one type of shipment and not other types, in our view, only adds to the ambiguity of the clause.

tionship each part bears to the other. Clauses 17(a) and 17(b) could conceivably refer to any one or to a combination of many possible situations. Coverage under these clauses might be determined by the actual physical place of stowage, the bill of lading under which the cargo traveled, the contract of carriage for the shipment, or the consent of the insured as to where its cargo should be stowed. It simply is not clear from the face of the policy when coverage under clauses 17(a) or 17(b) would be in effect.

Having concluded that the policy terms are ambiguous, we turn next to the construction of those terms. In our view, the district court properly construed the policy in favor of the insured. We think a fair and reasonable interpretation of the policy suggests that "UNDER DECK shipments" of clause 17(a) refers to shipments that were supposed to travel under deck. In other words, when an insured has contracted with its carrier for shipment of cargo below deck, clause 17(a) applies. It is irrelevant whether the cargo actually traveled below deck or whether the cargo was shipped pursuant to an under deck bill of lading, or, as in this case, pursuant to an unauthorized on deck bill of lading. The place of physical stowage or the bill of lading is not determinative of coverage; it is the contract of carriage that governs. As long as the shipper intended the cargo to be stowed below deck and so manifested its intent in its contract of carriage, clause 17(a) applies. Similarly, "ON DECK shipments" of clause 17(b) refers to all shipments that were supposed to travel on deck. In such an instance, a lesser degree of coverage is provided. In those cases, coverage is provided only for a total loss and only when that loss occurs as a result of certain perils. No coverage whatsoever is provided for fortuitous partial losses caused even by an insured-against peril. Furthermore, clause 8(B)(2) would appear to provide an additional limitation on clause 17(b), limiting the maximum possible recovery to $175,000 if the cargo was shipped subject to an on deck bill of lading or stowed on deck with the insured's consent. Construction of the policy in this manner comports with the logical assumption that an insurance company would provide, and an insured would buy, greater protection for shipments that were supposed to travel under deck than for shipments intended to be placed on deck. Accordingly, applying this construction to the facts herein, we believe it is clear that clause 17(a) is the operative provision. As discussed, Ingersoll's contract of carriage with Taiwan required under deck stowage. This being so, the provision which relates to shipments that were intended to travel below deck, namely clause 17(a), must govern.

Under clause 17(a), Ingersoll's loss would have been covered. Clause 17(a) insures against "all risks of physical loss or damage from any external cause." All risk coverage covers all losses which are fortuitious no matter what caused the loss, including the insured's negligence, unless the insured expressly advises otherwise. *Goodman v. Fireman's Fund Ins. Co.,* 600 F.2d 1040, 1042 (4th Cir.1979). A loss is fortuitous unless it results from an inherent defect, ordinary wear and tear, or intentional misconduct of the insured. *Id.* An insured satisfies its burden of proving that its loss resulted from an insured peril if the cargo was damaged while the policy was in force and the loss was fortuitous. *Atlantic Lines Ltd. v. American Motorists Ins. Co.,* 547 F.2d 11, 12 (2d Cir.1976); *accord Morrison Grain Co. v. Utica Mut. Ins. Co.,* 632 F.2d 424, 430–31 (5th Cir. 1980). The circumstances surrounding the placement of the Ingersoll cargo on deck and the resultant loss can fairly be characterized as fortuitous. It was the carrier that breached the contract of carriage by placing the cargo on deck. Ingersoll certainly did not engage in any intentional misconduct to cause the misplacement of its cargo. Moreover, even if the carrier was negligent in placing the cargo outside the area of the ship's hold, all risk coverage would still apply.

Construing Ingersoll's policy as providing full coverage for shipments stowed on deck without the shipper's consent is consistent with the purpose for which the policy was issued. All risk open cargo policies,

such as the one issued to Ingersoll, provide broad coverage for shippers. *See, e.g., Greene v. Cheetham*, 293 F.2d 933 (2d Cir. 1961); *Groban v. S.S. Pegu*, 331 F.Supp. 883 (S.D.N.Y.1971), *aff'd sub nom. Groban v. American Casualty Ins. Co.*, 456 F.2d 685 (2d Cir.1972). A shipper not located near a port has no practical control over how a steamship line may ultimately carry and protect its cargo. Even if it issues clear instructions as to stowage directly to the carrier, it has no guarantee that the carrier will comply. A carrier may negligently or inadvertently place cargo intended to be stowed below deck, above deck. A shipper may reasonably seek to avoid exposing itself to the potential risk of damage and to consequential losses by procuring insurance. To hold that Ingersoll's loss was not covered would be to render the insurance that it purchased from Fireman's Fund meaningless. It is not at all unreasonable to assume that Ingersoll procured insurance precisely to cover itself in situations such as this one—where the carrier placed its cargo on deck without Ingersoll's consent.

■ Fireman's Fund also argues that it should not be held liable under the policy because Ingersoll had a duty to inform the Fund after it learned of the on deck placement of its cargo on October 1, 1979. The Fund contends that had it been so advised, it would have instructed Ingersoll to get the cargo under deck or off the ship before the M/V Bodena sailed for Korea on October 14.[9] Violation of this duty to disclose, the Fund claims, voids the policy under the doctrine of *uberrimae fidei.*

■ The doctrine of *uberrimae fidei* requires a party seeking marine insurance to disclose all circumstances known to it which materially affect the risk. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 13 (2d Cir. 1986), *cert. denied*, ─ U.S. ─, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866,

870 (2d Cir.1985). If a party omits to disclose material information applicable to the risk involved, the policy is void. *Knight*, 804 F.2d at 13; *Thebes Shipping, Inc. v. Assicurazioni Ausonia SPA*, 599 F.Supp. 405, 426 (S.D.N.Y.1984) (quoting *McLanahan v. Universal Ins. Co.*, 26 U.S. (1 Pet.) 170, 185–86, 7 L.Ed. 98 (1828)). However, in our view, the doctrine is not applicable in the instant case. As discussed, clause 17(a) of Fireman's Fund's policy provided coverage for shipments traveling pursuant to under deck contracts of carriage. As interpreted hereinabove, Ingersoll's contract of carriage with Taiwan was one for under deck stowage. The fact that Ingersoll's cargo was actually stowed on deck, in breach of the contract of carriage, did not change the terms of the contract. Similarly, the fact that Ingersoll had constructive notice as of October 1 of that breach also did not change the terms of the contract of carriage or Ingersoll's rights thereunder. See section I, *supra*. Ingersoll's contract remained one for under deck shipment throughout the voyage. Since there was never any change in Ingersoll's contract of carriage, there was no change in circumstances affecting the risk insured which Ingersoll might have been required to disclose. The subject open cargo policy does not distinguish between under deck contracts of carriage that are performed and those that are breached. Coverage is provided for all shipments traveling pursuant to under deck contracts of carriage. Consequently, Ingersoll had no duty to inform Fireman's Fund that its cargo had been stowed on deck in breach of the contract of carriage. Indeed, it was to protect against just such an occurrence that Ingersoll most likely contracted for insurance in the first place.

**B.** *Fireman's Fund's Right of Subrogation Against Bernard and Taiwan*

■ The district court properly ordered that to the extent Fireman's Fund

---

**9.** Fireman's Fund makes a similar argument with regard to mitigation of damages. The Fund argues that Ingersoll failed to take any steps to remove the cargo from danger despite its knowledge as of October 1 that the cargo was stowed on deck and likely to incur damage. However, the burden of proving a failure to

mitigate damages falls on the insurer. *Emmco Ins. Co. v. Wallenius Caribbean Line, S.A.*, 492 F.2d 508, 514 (5th Cir.1974). The district court concluded that there was a "dearth of evidence" to show that unloading was a real and viable option and that appellants failed to meet their burden. 619 F.Supp. at 502.

makes payments to Ingersoll under its policy, it is entitled to recover such payments from Taiwan and Bernard, including taxable costs but excluding attorney's fees and litigation expenses. It is well settled that an insurer has an equitable right of subrogation as a matter of law upon making payment to its insured for a cargo loss. *Meredith v. The Ionian Trader*, 279 F.2d 471, 474 (2d Cir.1960). Bernard errs in contending that the Fund's failure to fulfill its contractual obligation to Ingersoll precludes it from being granted equitable subrogation. An insurance company retains its right of subrogation even after it litigates coverage and suffers a judgment requiring payment to the insured. *Id.; see also Bunge Corp. v. London Overseas Ins. Co.*, 394 F.2d 496, 497 (2d Cir.), *cert. denied*, 393 U.S. 952, 89 S.Ct. 376, 21 L.Ed.2d 363 (1968).

### C. *Attorney's Fees and Litigation Expenses*

The district court awarded Ingersoll attorney's fees ($590,381.96) and litigation expenses ($226,250.96) against Fireman's Fund for costs it incurred in prosecuting its suit against Fireman's Fund and the other defendants. Although the district court did not specifically apportion the fees and expenses allocable to the various defendants, it did advance two different theories to support the award. First, Ingersoll's fees and expenses incurred in suing Bernard, Taiwan, and Excellent Marine were awarded as compensatory damages, to make Ingersoll whole. Second, the fees and expenses incurred in suing the Fund were awarded because of the Fund's apparent bad faith in denying Ingersoll's claim.

 Apropos the fees and expenses attributable to Ingersoll's suit against Bernard, Taiwan, and Excellent Marine, those fees were a direct and foreseeable consequence of Fireman's Fund's breach. As a result of the refusal of Fireman's Fund to cover the loss, Ingersoll was forced to sue third parties and to bear the burdens of complex litigation. Where a breach of contract has caused a party to maintain a suit against a third person, courts have permitted recovery from the breaching party of counsel fees and other litigation expenses incurred in the suit. *Artvale, Inc. v. Rugby Fabrics Corp.*, 232 F.Supp. 814, 826 (S.D.N.Y.1964), *aff'd*, 363 F.2d 1002 (2d Cir. 1966); *accord Ranger Constr. Co. v. Prince William County School Bd.*, 605 F.2d 1298, 1301 (4th Cir.1979); *see Freed v. Travelers*, 300 F.2d 395, 399 (7th Cir.1962) (attorney's fees and expenses of litigation incurred in action against third parties proper elements of damage in action against insurer). Therefore, since Fireman's Fund's breach necessitated Ingersoll's suit against other defendants, the Fund was properly held responsible for Ingersoll's attorney's fees and litigation expenses. Fireman's Fund may not recover those costs from the other defendants, as it argues it should, because in the ordinary course, it could have paid Ingersoll's claim and then commenced its own litigation against the other defendants as Ingersoll's subrogee. In such an action, the Fund would have had to bear its own fees and expenses.

 Second, apropos the fees and expenses attributable to Ingersoll's suit against Fireman's Fund, the general rule is that the award of fees and expenses in admiralty actions is discretionary with the district judge upon a finding of bad faith. *Seguros Banvenez, S.A.*, 761 F.2d at 861–62. As a party subject to admiralty jurisdiction, *Big Lift Shipping Co. (N.A.) v. Bellefonte Ins. Co.*, 594 F.Supp. 701, 704 (S.D.N.Y.1984), marine insurers also are subject to this rule. *See Puritan Ins. Co.*, 779 F.2d at 873. We acknowledge an awareness of the district judge's dissatisfaction with Fireman's Fund for refusing to pay Ingersoll's claim. Judge Carter characterized explanations given by Fireman's Fund as "*contrived, concocted* solely to keep from paying" its obligations under the policy. 619 F.Supp. at 506 (emphasis added). Moreover, noting conflicting and inconsistent testimony among Fund officials, he observed that "Fireman's Fund had *conjured* up its *strained* reading of the insurance policy solely in an effort to avoid accepting the liability the policy imposed." *Id.* at 507 (emphasis added).

However, we note that the district court never explicitly found that Fireman's Fund acted in bad faith in denying Ingersoll's claim. In light of the ambiguity inherent in the Fund's policy and our lengthy discussion herein necessary to analyze the ambiguity, we cannot conclude that the Fund was unjustified in rejecting Ingersoll's claim. Whether the damage to Order # 24441 was covered under the Fireman's Fund open cargo policy seems to us to be a difficult issue, one which constitutes a perfectly valid basis for contest and litigation. Accordingly, we reverse the award of attorney's fees and litigation expenses insofar as they are allocable to Ingersoll's suit against Fireman's Fund. We remand to the district court to determine, using the method it deems appropriate, how much of the sum total of Ingersoll's attorney's fees and litigation expenses is attributable to its suit against Fireman's Fund and how much to its suit against each of the other defendants and to apportion accordingly.

In its final judgment, dated April 25, 1986, the district court apparently included only those attorney's fees and litigation expenses incurred through August 31, 1985, leaving subsequent expenditures for calculation after any appeal. While we decline to impose attorney's fees and litigation expenses against Fireman's Fund in this Court for prosecuting either a frivolous appeal, Fed.R.App.P. 38, or one calculated to achieve delay, 28 U.S.C. § 1912, we do note that in calculating expenditures after August 31, 1985, the district court, in its discretion, in order to make Ingersoll whole, might include those amounts that properly can be attributed to Ingersoll's defending the appeal taken by Bernard and Taiwan. Of course, those fees and expenses that relate to Ingersoll's defense of Fireman's Fund's appeal, as well as those attributable to Ingersoll's cross-appeal, are beyond the scope of the compensatory damage rationale.

### V. DAMAGES and PREJUDGMENT INTEREST

#### A. *Damages*

■ Both Fireman's Fund and Ingersoll dispute the district court's computation of total damages of $977,899. Fireman's Fund seeks to *reduce* the total award by $90,970 which was awarded as damages representing the interest for delay in Ingersoll's receiving contract payments from Hyundai. The Fund claims that interest for delay is not properly recoverable under its policy. On the other hand, Ingersoll seeks to *increase* its award by $48,287 which represents Waldrich's expense of financing the costs of repairing Order # 24441 and by $157,585 which is said to represent Waldrich's corporate overhead and profit.

■ Ordinarily, a district court's computation of damages in a cargo case is a factual determination that will not be disturbed on appeal unless it is clearly erroneous. *Seguros Banvenez, S.A.*, 761 F.2d at 861. In our view, the district judge carefully considered all items submitted to him by the parties as elements of damages; he awarded some, and rejected others. As to Fireman's Fund's claim that damages should be reduced, under its policy it was obligated to indemnify Ingersoll in full for its loss which includes Ingersoll's damage for the loss of use of contract payments. As to Ingersoll's claim that damages should be increased, financing costs can reasonably be viewed as a part of overhead; what amount of overhead and profits to award was specifically considered by the district court and included in the final calculation. We find no error in the computation of damages.

#### B. *Interest Rate on Prejudgment Interest*

■ In accordance with our direction that in admiralty cases prejudgment interest "should be granted in the absence of exceptional circumstances," *Mitsui & Co. v. American Export Lines*, 636 F.2d 807, 823 (2d Cir.1981), the district court calculated prejudgment interest from the date of payment for the repairs through the date of judgment. Ingersoll objects to the rate of interest used, contending that the proper rate should have been the rate at which Ingersoll actually invested its excess cash

during the periods in question, or alternatively, a single, uniform, constant rate based on the rate for federal paper, as specified in 28 U.S.C. § 1961, which sets forth the method for computation of *post-judgment* interest. The rule in this Circuit, however, is that the rate of interest used in awarding *prejudgment* interest rests firmly within the sound discretion of the trial court. *Independent Bulk Transp., Inc. v. The Vessel "MORANIA ABACO",* 676 F.2d 23, 26 (2d Cir.1982). A "[p]laintiff is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk-free obligations." *Id.* at 27. In exercising its discretion, the district court determined that rather than using a single Treasury Bill rate applied retroactively over the relevant periods as initially proposed, using an average rate for each period would be fairer because the rate on Treasury Bills was subject to wide fluctuation during those periods. Accordingly, the district court applied rates ranging between 9.676% and 10.112%. We cannot say that in determining prejudgment interest based upon an average of prevailing Treasury Bill rates, which are short-term, risk-free obligations, the district court abused its discretion.

### CONCLUSION

To summarize: we hold that (1) Taiwan, Bernard, and Fireman's Fund all breached their respective contracts with Ingersoll and are therefore jointly and severally liable to Ingersoll for damages and prejudgment interest as determined by the district court; (2) Fireman's Fund was properly held responsible only for Ingersoll's attorney's fees and litigation expenses allocable to its suit against Bernard, Taiwan, and Excellent Marine but not for those allocable to its suit against Fireman's Fund; (3) Fireman's Fund may recover from Bernard and Taiwan to the extent it actually pays Ingersoll's damages (excluding attorney's fees and litigation expenses); and (4) the claims of Bernard and Taiwan against each other for indemnification were properly dismissed.

The judgment of the district court is affirmed in part and reversed in part, and the case is remanded to the district court for the apportionment of attorney's fees and litigation expenses.