AMERICAN NATIONAL FIRE INSURANCE COMPANY, Plaintiff–Appellant–Cross–Appellee,

v.

Thomas J. KENEALY and Diane Kenealy, Defendants–Appellees–Cross–Appellants.

Nos. 127, 243,
Docket 95–7196, 95–7236.

United States Court of Appeals,
Second Circuit.

Argued Aug. 28, 1995.

Decided Dec. 13, 1995.

---

James W. Carbin, Kroll & Tract, New York City (Christopher B. Turcotte, on the brief), for Plaintiff–Appellant–Cross–Appellee.

Mona D. Shapiro, Banks, Pickett, Gruen & Shapiro, L.L.P. Mount Kisco, NY (Steven E. Waldinger, Kelli M. O'Brien, on the brief), for Defendants–Appellees–Cross–Appellants.

Before CARDAMONE, MINER and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

When agreements between insurers and their insureds are modified, the full significance of the changes is all too often unclear. When the doubts that arise from the modifications themselves are compounded by uncertainties that stem from the ambiguous role played by an insurance broker acting between the parties, the result is apt to be anything but pleasant. Today, we are asked to decide whether such a modified insurance agreement covered the circumstances of an accident at sea, and whether New York law or federal admiralty law governs the award of attorneys' fees.

## BACKGROUND

After purchasing a forty-one foot boat, the "Fin Chaser," Thomas and Diane Kenealy asked The Fitzpatrick Agency, Incorporated (Fitzpatrick) to make yacht insurance available to them. In 1982, Fitzpatrick insured the boat with The Insurance Company of North America. In subsequent years, the boat was at various times insured by CIGNA, Reliance Insurance Company, and Travelers Insurance Company.

In September 1992, Fitzpatrick insured the "Fin Chaser" with American National Fire Insurance Company (American National). The policy contained the following relevant clauses:

**Insuring Agreement**

For payment of premiums when due, and subject to the terms of this policy, "we" will provide the coverages agreed upon. These coverages are indicated by the entry of specific limits of liability on the Declarations page.

**Definitions**

. . . .

10. "We," "us" and "our" refer to the Company providing this insurance.

. . . .

**Conditions**

. . . .

**3. Navigation Limits**

This policy provides coverage when the "insured yacht" is being used or navigated within navigation limits specified on the

Declarations page. There is no coverage under this policy if the "insured yacht" is being used or navigated outside the navigation limits specified on the Declarations page.

. . . .

#### 17. Changes

All agreements between "us" and "you" are contained in this policy. Any changes in this policy must be agreed to and endorsed by "us." Should a premium charge be required, premium will be adjusted as of the effective date of the endorsement making the policy change.

The policy declarations also stated that there would be a "lay up period," a time when the boat was not in use, and that this period ran from December 1 to April 1. Finally, the policy established navigation limits as: "UNITED STATES ATLANTIC COAST-WISE AND INLAND WATERS BETWEEN EASTPORT, MAINE AND CAPE HATTERAS, NORTH CAROLINA." The Continuation Certificate, dated August 11, 1993, maintained the same lay up period and geographical limits.

In August 1993, the Kenealys decided to take their boat to Florida and the Bahamas for the winter. They contacted Fitzpatrick and asked that the navigation limits be extended and that the lay up provision be deleted. Fitzpatrick subsequently sent a fax to American National, requesting among other things that the geographical limits be broadened to include Florida and the Bahamas until May 1994 (a date Mr. Kenealy states that he never knew about or wanted). American National agreed by reply fax to Fitzpatrick. Fitzpatrick then sent the following letter to the Kenealys, on September 4:

> This will serve to confirm that coverage has been bound to extend the navigation territory on your yacht policy through Florida and the Bahamas. The lay-up period on policy has been deleted. You now have 12 months of wet navigation. Your current policy will be endorsed effective 9/10/93. Your renewal will also be endorsed accordingly. The additional annual premium is $412.

> I have also included the wording in your policy concerning latent defects.

A few days later, American National promulgated General Change Endorsement No. 3. It stated in relevant part:

> It is hereby understood and agreed that effective September 10, 1993 the navigation limits have been extended to include: Florida and the territorial waters of the Bahama islands from September 10, 1993 until May 1994 and the lay up period has been deleted.

> This will effect an increase in premium of $53 for the period of September 10, 1993–October 30, 1993 (pro-rata of $412) and an additional $412 for the 10/30/93 renewal. The new total annual premium is $1,964.

> All other policy terms and conditions remain unchanged.

Fitzpatrick claims that it sent this document to the Kenealys, but the Kenealys say that they never received it and no evidence was presented to the contrary. In any event, at some point in the Fall of 1993, the Kenealys set sail (or, more likely, motor) for warmer climes.

The seas did not prove friendly and on June 7, 1994, the "Fin Chaser" did just that, and sank in Bahamian waters. The next day, Mr. Kenealy informed American National, and the insurance company promptly began this action seeking a declaratory judgment that it had no liability because the boat was outside the policy's navigation limits when it sank. The Kenealys counterclaimed, seeking payment under the policy, attorneys' fees, and pre-judgment interest.

The district court, in an oral decision, concluded that Fitzpatrick was cloaked with the apparent authority of American National when it sent the September 4, 1993 letter to the Kenealys. It further held that the letter indicated that Bahamian waters were within the policy's navigation limits for at least a year, that the Kenealys relied on that letter, and that their yacht was therefore covered when it sank. Pursuant to this holding, the Kenealys were awarded a judgment of $236,-247.26.

American National, appealing, argues that the text of the agreement directly contradicts

the district court's finding because Condition 17 of the policy states that the Kenealys could not rely on any change made in the policy except those expressly agreed to and endorsed by "us," *i.e.*, American National itself. American National also challenges the district court's refusal to consolidate this action with one it brought against Fitzpatrick.

The district court denied attorneys' fees on the ground that they are not available under federal admiralty law. The Kenealys have filed a cross-appeal, seeking such fees.

## DISCUSSION

*Apparent Authority*

■ The Kenealys successfully argued in the district court that Fitzpatrick had the apparent authority of American National and that they could and did rely on that authority. American National responds by stating that Fitzpatrick was not its agent and hence could not bind it. Since we are reviewing a summary judgment, we consider the facts in the light most favorable to American National. *See Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 15 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). We believe, however, that several documents, taken together, justify the district court's holding that apparent authority existed as a matter of law.

First, the original 1992 American National policy refutes American National's contention that Fitzpatrick was not its agent. The document states:

> This policy is signed by the President and Secretary of the member company of Great American Insurance Companies which is the insurer under this policy. It is countersigned on the Declarations page by a duly authorized agent of the company.

Fitzpatrick was in fact the "duly authorized agent" who signed the declarations page. A separate December 1992 American National document, "Yacht Policy Declarations," further supports this conclusion, for the December document—sent to the Appellees by American National—stated that Fitzpatrick was the "agent or broker."

Second, American National's premium bills constitute additional evidence of Fitzpatrick's apparent authority. They state:

> Please contact the above producer [Fitzpatrick] with any questions or changes regarding your policy or premiums. If you have specific billing questions, you may contact our choice billing unit at (800) 847–4357 or (513) 847–4357 in Ohio....

In effect, these bills held Fitzpatrick out as acting for American National, and thus reinforced the impression, created by the original 1992 policy, that Fitzpatrick was the "duly authorized agent" of American National.

Third, the Kenealys introduced a January 1993 "Yacht Endorsement" letter, which they received from Fitzpatrick, as further proof that Fitzpatrick was held out to be American National's agent. Enclosed with this letter was a "General Change Endorsement," dated December 1992. The endorsement amended the loss payee and reduced the annual premium by $549. Neither the Fitzpatrick letter nor the General Change Endorsement made any reference to American National, despite the fact that the Endorsement said it "changes the policy." Although these documents were sent by Fitzpatrick rather than American National, the Kenealys argue that these were the only documents entitled "Endorsement" that they ever received, that their reduced payments were accepted as correct by American National, and that they therefore were entitled to assume that Fitzpatrick was as able to "endorse" other changes as it had been to "endorse" this one.

■ On the basis of these documents, the district court correctly concluded that the Kenealys could rely on Fitzpatrick's September 4, 1993 letter as an effective statement of the changes that had been made in the underlying policy. The various documents created an unmistakable impression that Fitzpatrick was American National's agent, and we agree with the district court that a contrary finding would be unreasonable. American National, nonetheless, argues that Condition 17 of the policy expressly requires changes to be made by the insurance company itself and that the Kenealys were bound by that condition.

This clause, however, is not the ironclad prohibition against agency representation that American National would have us believe it to be. The clause requires only that a change "must be agreed to and endorsed by 'us.'" It, understandably, states that changes must be approved by the company and that insureds cannot unilaterally make changes (*e.g.*, by leaving a message with the company the night before a trip asking them to extend the policy). But while Definition 10 does state that "we," "us," and "our" refer to the company that provides the insurance, neither Definition 10 nor Condition 17 ever specifies that the company may not act through agents. They do *not* say, for example, that changes made by an agent are not "agreed to and endorsed" by the company. They are, in fact, totally silent on that question, and this silence crucially distinguishes the case before us from all those cited by Appellant.

American National had ample opportunity to inform its insureds of limits it wished to place on the authority of putative agents. Clauses restricting agent authority have been commonplace in New York for over seventy years. *See, e.g., Bible v. John Hancock Mut. Life Ins. Co.*, 256 N.Y. 458, 461, 176 N.E. 838, 839 (1931) (Cardozo, C.J.) (a contract clause stating that changes must be made by "the President, a Vice President, the Secretary or an Assistant Secretary, and no other person is authorized on behalf of the company to make, alter or discharge this contract or to waive forfeiture" and that "[a]gents are not authorized to waive any of the terms or conditions of this policy" is valid as to future, but not past, waivers of policy terms by an agent); *Drilling v. New York Life Ins. Co.*, 234 N.Y. 234, 241, 137 N.E. 314, 316 (1922) (upholding the validity of a similar anti-agency clause). *See also Broidy v. State Mut. Life Assur. Co.*, 186 F.2d 490, 494–95 (2d Cir.1951) (citing *Bible* and *Drilling* and holding that an agent can bind a company "unless the insured has notice of an actual limitation on the agent's authority").

American National places substantial reliance on *Drennan v. Sun Indemnity Co.*, 271 N.Y. 182, 2 N.E.2d 534 (1936). In that case, the New York Court of Appeals held that "where the [insurance] company gives to an assured notice of a limitation upon the authority of an agent, the assured can hold the company upon an agreement made by the agent in disregard of such limitations only where it is shown that the company has removed the limitations." *Id.* at 186, 2 N.E.2d 534. Appellant claims that the policy at issue in *Drennan* is remarkably similar to Condition 17. In fact, it is quite different. In *Drennan* the policy stated: "No erasure or change appearing on this policy as originally printed ... shall be valid unless set forth in an endorsement added hereto and signed by the President or the Secretary of the Company." *Id.* It went on to say that: "Neither notice given to nor the knowledge of any agent or any other person ... shall be held to waive any of the terms ... of this policy...." *Id.* Both the requirement that changes be signed by the President or Secretary and the second clause—the "anti-agency" provision—are absent in the policy before us. It is therefore easy to conclude, quite apart from its past acceptance of agent-made changes, that American National failed in Condition 17 and Definition 10 of the policy to use the unequivocal language that New York requires if apparent authority is to be precluded.

█ The underlying question in all these cases is which party should bear the burden of monitoring the apparent authority of a putative agent, the insureds or the insurer. Economies of scale, superiority of resources and of information, as well as experience in monitoring combine to make insurers powerful monitors of alleged agent representations. But insureds also have significant advantages in monitoring representations made by insurance brokers since they, and not the insurer, hear the representations. Under the circumstances, the most important thing is for the law to be clear so that the parties may know whose responsibility it is to monitor. A default rule placing the burden on the insurance company and requiring it to contract out of its duty, explicitly and unequivocally, is one way to achieve the desired clarity.

Such a rule recognizes that using agents is often to the insurer's advantage. It, in effect, prohibits insurers from taking the bene-

fits of agency representation while still strategically withholding information as to what authority the agent actually has, and whether the company is bound if an accident occurs.[1] Here, American National withheld its position on liability for putative agents at the time the contract was formed. It did the same when it held Fitzpatrick out as its agent for purposes of making changes in fees in December of 1992. Only when it became inconvenient to be bound by Fitzpatrick did it change course. The lesson of *Broidy, Bible,* and *Drilling* is that this is precisely what it may not do.

American National argues, instead, for the opposite default rule and suggests that a consumer who deals with a putative agent has the duty to determine the scope of the agent's authority, and that the alleged principal can be liable only if it had knowledge of the agent's representation and failed to repudiate it. Like the "Fin Chaser," this argument will not float. In support of this claim, American National cites only *Merex A.G. v. Fairchild Weston Systems, Inc.,* 810 F.Supp. 1356 (S.D.N.Y.1993), a district court opinion that is flatly contradicted by our holding in *Herbert Construction Co. v. Continental Insurance Co.,* 931 F.2d 989, 995 (2d Cir.1991) ("[A] recovery based on the doctrine of apparent authority does not require that the third party have inquired into the scope of the agent's authority;" only in cases where seemingly actual authority is placed in doubt by a transaction that is "extraordinary" or patently fraudulent does a duty to inquire into the state of that authority arise).

We hold, therefore, that the district court did not err in its finding that the September 4, 1993 letter bound American National.

1. For an economic analysis of strategic withholding of information, see Ian Ayres & Robert Gertner, *Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules,* 99 Yale L.J. 87, 93–94 (1989).

2. In this respect, we note that the Kenealys, in referring to the $53 prorated premium, cite General Endorsement No. 3. We also note that the Kenealys assert that they never received this Endorsement. While the failure to receive the Endorsement is irrelevant to the question of what American National intended the $412 additional annual premium to cover, the same failure is of

### Representations Made

Our finding that Fitzpatrick had apparent authority to act for American National does not, however, dispose of this case. The question remains whether Fitzpatrick actually made representations to the Kenealys that justified a belief that coverage to the Bahamas and Florida had been extended for a full year. In other words, what precisely did the September 4, 1993 letter represent to the Kenealys?

The Kenealys argue that Fitzpatrick's September 4 letter led them to think that they had received a full-year extension on the geographical limits of their insurance policy. They contend that the language of the letter indicates year-round coverage for Florida and the Bahamas because it states: "This will serve to confirm that coverage has been bound to extend the navigation territory on your yacht policy through Florida and the Bahamas" and because it follows that statement with an additional statement that "[y]ou now have 12 months of wet navigation." They further assert that the only way to understand the prorating between policy years of the additional premium charged as a result of the modifications is if the change in geographical limits under the new policy was intended to be valid for a full year.

But in fact, the language of the September 4 letter contains no clear statement that the extension would be year-round. Except as to "wet navigation," it omits reference to a date altogether. And the relationship of the additional annual premium of $412.00 to the $53.00 prorated additional charge made for September 10–October 30 in the previous policy year, though suggestive, is not conclusive enough to support a summary judgment.[2]

course relevant to whether the Kenealys could read the $412 additional premium mentioned in the September 4 letter (which they did receive) as a fee for extending navigation limits for a whole policy year. It is, nonetheless, more than possible that, between the time the Kenealys received the September 4 letter and the time that the "Fin Chaser" sank, the Kenealys received bills for September 10–October 30 that reflected the $53 prorated charge. Such bills could explain the meaning of the $412 charge. All this, like any contrary explanations of the $412 that American National may be able to offer, are

On the record before us, we believe that a question of fact exists as to whether Fitzpatrick represented that the policy change permitted Bahamian sailing for the full policy year. For this reason, it is necessary to reverse the grant of summary judgment to the Kenealys and to remand the case to the district court to determine, in further proceedings, whether the statements of Fitzpatrick led the Kenealys properly to believe that the geographical limits of their policy had been extended year-round.[3]

## Attorneys' Fees

■ The Kenealys, as Cross–Appellants, claim that they should have been awarded attorneys' fees in the district court since that court ruled for them on the merits. The district court held, instead, that attorneys' fees are not available in federal admiralty law.

This action was, indeed, brought in admiralty. But the Kenealys argue that *Wilburn Boat Co. v. Fireman's Fund Insurance Co.*, 348 U.S. 310, 321, 75 S.Ct. 368, 374, 99 L.Ed. 337 (1955), held that issues of admiralty law should be determined by state law unless there is an established federal rule, that here there is no established federal rule, and that the relevant New York state law awards attorneys' fees in cases like this one.

In *Puritan Insurance Co. v. Eagle Steamship Co.*, 779 F.2d 866 (2d Cir.1985), the district court had applied New York law on attorneys' fees. We remanded and asked the district court to "determine whether there is a settled federal admiralty rule—or whether there should be a uniform federal rule—involving the award of attorney's fees." *Id.* at 873. But our decision in *Puritan* did not resolve the issue. *Cf. Sause Bros. Ocean Towing*, 801 F.Supp. 378, 381 (D.Or.1991) ("*Puritan* does not preclude a finding that the Oregon fee statute applies here."). Two years after *Puritan*, however, we announced

"the general rule ... that the award of fees and expenses in admiralty actions is discretionary with the district judge upon a finding of bad faith." *Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 309 (2d Cir.1987), *cert. denied sub nom. J.E. Bernard & Co. v. Ingersoll Milling Mach. Co.*, 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988). And this would seem to settle the matter.

The Kenealys argue, however, that *Ingersoll*'s holding should be confined to its facts, that is, to cases where an *insured* sues an *insurance company*. That would make federal admiralty law the equivalent of New York law, which provides attorneys' fees when an insured "has been cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations" but not in "an affirmative action brought by an assured to settle its rights." *Mighty Midgets, Inc. v. Centennial Ins. Co.*, 47 N.Y.2d 12, 21, 416 N.Y.S.2d 559, 564–65, 389 N.E.2d 1080, 1085 (1979); *see also Barry v. Romanosky*, 147 A.D.2d 605, 606–07, 538 N.Y.S.2d 14 (2d Dep't 1989).

■ We disagree. While *Ingersoll* did not specifically examine cases brought by insurance companies, it stated the federal prohibition against attorneys' fees in admiralty suits in the broadest of terms. It did not temper its holding by suggesting that a different rule would apply if the insurance company brought the action. We believe that our holding in *Ingersoll* suffices to "establish" a federal admiralty rule, which now must be followed instead of state law. *See Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207, 223, 106 S.Ct. 2485, 2494, 91 L.Ed.2d 174 (1986) ("[T]he extent to which state law may be used to remedy maritime injuries is constrained by a so-called 'reverse–Erie' doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards."); *Galt G/S v. Hapag–Lloyd AG*, 60 F.3d 1370,

precisely the sorts of questions that must be examined on remand, and whose existence precludes a summary judgment at this time.

**3.** American National also appealed the district court's denial of its motion for consolidation of this suit with a suit it brought against Fitzpatrick. Consolidation is proper "when actions involving a common question of law or fact are

pending before the court" and "to avoid unnecessary cost or delay." Fed.R.Civ.P. 42. As the district court noted, the action against Fitzpatrick raises many issues of fact not present in the litigation here. Accordingly, it did not abuse its discretion in denying the consolidation and we affirm its denial.

1373 n. 1 (9th Cir.1995) (same); *Mentor Ins. Co. v. Brannkasse,* 996 F.2d 506, 513 (2d Cir.1993) ("In admiralty cases, federal maritime law applies where it exists.").

While the Fifth Circuit, writing before *Ingersoll,* found no established federal admiralty rule on attorneys' fees, the First and Third Circuits, writing after *Ingersoll,* have reached the same result as *Ingersoll.* Compare *INA v. Richard,* 800 F.2d 1379, 1381 & n. 2 (5th Cir.1986) (per curiam) (holding that state law applies), *with Southworth Mach. Co. v. F/V Corey Pride,* 994 F.2d 37, 41–42 (1st Cir.1993) (holding that state provision providing for attorneys' fees was inconsistent with federal admiralty law and that federal law should be applied), *and Sosebee v. Rath,* 893 F.2d 54, 56–57 (3d Cir.1990) (applying federal rule because of uniformity considerations). We agree with *Southworth* and *Sosebee,* and see no reason (nor do the Kenealys provide us with any) to limit *Ingersoll.*

■ The Kenealys argue, however, that even under *Ingersoll* they should receive attorneys' fees because the insurance company was motivated by bad faith. The district court did not find bad faith and we discern no facts here that would justify reversing that finding. There is no evidence that American National sought to mislead the Kenealys on the issue of the agent's authority, and "bad faith" certainly requires more than a failure to police an agent's representations. The policy was ambiguous. To the extent that we hold that the policy did not disclaim liability for the actions of an apparent agent, we have read the policy against the insurer. But it is not bad faith for an insurer to fight liability when policy coverage is unclear. *See Ingersoll,* 829 F.2d at 309–10 (no bad faith where policy is ambiguous).[4]

Since we remand for further proceedings to determine the merits of the case, the issue of fees may, in one sense, seem premature. But because we find that the federal admiralty rule clearly controls this case, and be-

cause, as the district court held, there is at the moment no evidence of bad faith, we deem it appropriate to indicate that we believe the district court was correct in refusing to award attorneys' fees to the Kenealys.

### CONCLUSION

We affirm the district court's holding that Fitzpatrick had apparent authority to bind American National. We reverse the district court's grant of summary judgment to the Kenealys and we remand to the district court for further proceedings to determine whether Fitzpatrick had in fact led the Appellees to believe that they had received a year-round extension of the geographical limits of their policy.

---

4. American National argues that the Kenealys are procedurally barred from seeking attorneys' fees in this case. It relies on Fed.R.Civ.P. 54(d)(2)(B), which provides that a motion for attorneys' fees must be filed no later than 14 days after entry of judgment, and must state the amount sought. No Rule 54(d)(2)(B) motion was

made by the Kenealys. But we are not aware of any authority, and American National points to none, that suggests that this rule is triggered when a district court *denies* an award of attorneys' fees as part of its determination on a motion for summary judgment.